**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DARREN CUFF,<br><br>                    Plaintiff,<br><br>          v.<br><br>TRANS STATES HOLDINGS, INC.,<br>TRANS STATES AIRLINES, GOJET<br>AIRLINES, LLC, and ED<br>TROWBRIDGE, Individually,<br><br>                    Defendants. | Case No. 10 C 1349<br><br>Hon. Harry D. Leinenweber |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Darren Cuff ("Cuff") brought the instant two-count complaint alleging interference and retaliation under the Family Medical Leave Act, 29 U.S.C. § 2615 (the "FMLA"). Cuff's suit names Trans States Holdings, Inc. ("TSH"), Trans States Airlines, LLC ("TSA"), and GoJet Airlines, LLC ("GoJet"), and Ed Trowbridge ("Trowbridge"), the managing director of customer and ground services for TSH. The Defendants seek summary judgment on both counts on a number of grounds, including that TSA was the only entity that employed Cuff, and it is not subject to the provisions of the FMLA. Cuff brings a cross-motion for summary judgment for liability on his FMLA interference claim. For the reasons that follow, Cuff's Motion for Summary Judgment on his FMLA interference

claim is granted, and the Defendants' Motion for Summary Judgment is denied.

## I.  BACKGROUND

### A.  Motion to Strike

As a preliminary matter, Cuff moves to strike the affidavit of Gerald Wigmore, ("Wigmore") who is the Senior Vice President and Chief Financial Officer of TSH.  Cuff also moves to strike any argument by Defendants that Cuff overused narcotics.

Cuff was employed as "Regional Manager-United Express Operations" at O'Hare Airport in Chicago from October 2006 until his termination on January 11, 2010.  The identity of Cuff's employer is at issue, however, which is key to determining whether Cuff was even entitled to FMLA leave.  In order to be a covered employer under the FMLA, the employer must employ at least 50 employees within 75 miles of the employee's worksite.  29 U.S.C. § 2611 (2)(B)(ii); *Thomas v. Pearle Vision, Inc.*, 251 F.3d 1132, 1136 (7th Cir. 2001).

Defendants argue that Cuff was employed solely by TSA, the company listed on his paychecks and W-2 forms, while Cuff argues Defendants are joint or integrated employers as those terms are used in the FMLA, making him eligible for coverage despite the 50-employee rule.  Wigmore's affidavit provides information about the corporate structure of TSH and two of its wholly-owned subsidiaries, TSA and GoJet.

- 2 -

Cuff takes issue with Wigmore's affidavit because it supplements the FED. R. CIV. P. 30(b)(6) testimony previously offered by Defendants' corporate representatives. Cuff cites case law standing for the proposition that this rule requires business entities to designate a deponent who is able to provide adequate testimony concerning the subjects identified in the Rule 30(b)(6) notice. *See Smithkline Beecham Corp. v. Apotex Corp.*, No. 98 C 3952, 2000 WL 116082, at *8 (N.D. Ill. Jan. 24, 2000).

But Cuff stretches the applicable law too far. A corporation is bound by this testimony in the same way that an individual deponent would be, but "this does not mean that a witness has made a judicial admission that formally and finally decides an issue." *Canal Barge Co. v. Commonwealth Edison Co.*, No 98 C 0509, 2001 WL 817853, *1 (N.D. Ill. July 19, 2001) (quoting *W.R. Grace & Co. v. Viskase Corp.*, 90 C 5383, 1991 WL 211647, at *2 (N.D. Ill. Oct. 15, 1991)). So a business entity may produce evidence that supplements or is contrary to its Rule 30(b)(6) deposition testimony. *W.R. Grace*, 1991 WL 211647, at *2. However, its witnesses are of course subject to cross-examination and impeachment if they contradict statements given by the company's Rule 30(b)(6) deponent. *Id.*

Cuff relies on *Fischer v. Avanade, Inc.*, 519 F.3d 393, 406-07 (7th Cir. 2008), but that case is distinguishable. In *Fischer*, the Seventh Circuit held that affidavits, when offered to contradict

- 3 -

the affiant's deposition, lack credibility and should be disregarded in summary judgment proceedings unless the affiant can plausibly explain the discrepancy. Here, Cuff points to one discrepancy between the Wigmore affidavit and the testimony of Defendants' Rule 30(b)(6) deponents. Terry Basham ("Basham"), the Vice President of Customer Service for TSH and its Rule 30(b)(6) deponent, testified during his deposition that the corporate defendants share accounting, legal, and payroll departments. Wigmore's affidavit contends that TSA and GoJet contract with TSH for the provision of these services. This is not a contradiction as much as an explanation, so the affidavit may stand. *See Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1007 (7th Cir. 1999) (holding that witness may clarify ambiguous or incomplete deposition testimony). In *Fischer*, an employment discrimination case, the court noted that because the witness had two prior opportunities to explain why the employee was passed over for a position, his initial failure to provide a detailed explanation raised a fact issue as to whether the detailed explanation in his affidavit was a later fabrication. *Fischer*, 519 F.3d at 407. Basham's failure to provide a detailed explanation as to how TSH's affiliates received certain services from the company does not raise the same suspicions.

Cuff also seeks to strike any argument by Defendants that he overused narcotics. But because the Court has previously granted

Defendants' motion to amend its affirmative defenses, this request also is denied and the motion to strike is denied in its entirety.

## B. Facts

The following facts are taken from the parties' Local Rule 56.1 statements, deposition testimony, and exhibits.

### 1. Cuff's Background

Cuff was employed at O'Hare Airport in Chicago. As a regional manager, he was responsible for maintaining a working knowledge of airport operations and acting as a liaison to the FAA and other government agencies. Basham hired Cuff and supervised him until October 2008. Thereafter, Trowbridge supervised him. The two did not get along, as Cuff was unhappy with Trowbridge's management style and thought he was a micromanager.

Cuff's business card bore the logo of all three companies, and he contends that he was required to, and did, do work for all three companies on a regular basis. Cuff was identified in internal directories as the contact for all three Defendants at the airports in his region. Cuff points to deposition testimony from Basham that his job description included work for GoJet and TSA, as well as his own testimony that he performed work for both companies "every day." He also points to an e-mail from Tom Haarmann ("Haarmann"), the customer service manager for GoJet, asking him to find out who accessed a certain door at the airport.

In an affidavit, Cuff asserts that he participated in employee meetings for both TSA and GoJet, drafted policies and procedures for both airlines, and represented both airlines during meetings with United Airlines about United Express operations. He also contends that he had access to both TSA and GoJet's computer systems. Cuff also has submitted a November 7, 2008, e-mail from Trowbridge to various airlines informing them that "[e]ffective immediately, Darren Cuff, Regional Manager, Trans States Holdings, Inc. will be your go to person if there are any operational issues or concerns with Trans States or GoJet Airlines flights operating in and out of your cities." (This also calls into question Defendants' assertion that Cuff was solely an employee of TSA, given that Trowbridge explicitly identified him as working for TSH.) Cuff also has supplied e-mails from the U.S. Department of Homeland Security that indicate he was a contact person for both GoJet and TSA.

Basham's testimony in part supports that of Cuff on this issue in that he acknowledged that Cuff was expected to support Haarmann and represented both airlines in dealings with United Express and the Department of Homeland Security. While Defendants vigorously dispute that Cuff was employed by GoJet in their briefing, the point to little record evidence disputing his contentions. They acknowledge that Cuff's business card bore the logo of all three companies, and their only response to Cuff's contentions that he

did perform work for all three companies is to say, "[t]here is no evidence that Cuff was required to perform work for GoJet." Def.'s Resp. in Opp'n to Pl.'s Statement of Facts, ¶ 34. Given that Cuff has pointed to record evidence supporting his position, this is insufficient.

Several of the other denials in Defendants 56.1(b)(3) Response in Opposition to Plaintiff's Statement of Facts do not cite to any evidence in the record. For example, Defendants contend that Haarmann merely asked Cuff to check the door as a favor, but cite to no evidence supporting this interpretation. *Id.* at ¶ 36. They also point to no record evidence supporting their contentions that Cuff had access only to TSA's computers or that while Cuff was listed as the on-site contact for GoJet, all functions were performed by Haarmann. *Id.* at ¶ 37, 38. Such general denials amount to admissions. *See Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000).

Regardless, in July 2008, Trowbridge approved Cuff's FMLA leave for Crohn's disease and bipolar disorder. However, Defendants characterize this approval as "inadvertent." It is undisputed that TSA employs only 33 workers within 75 miles of O'Hare, so if TSA alone employed Cuff, he would not have been entitled to FMLA benefits. For the purposes of this motion, Defendants do not challenge Cuff's position that TSH and TSA are joint or integrated employers, but contend that TSH had no

employees within 75 miles of O'Hare at the time of Cuff's leave request.

In late 2009, Cuff experienced health issues related to his bipolar disorder. He met with his physician, Dr. Eric Christoff ("Christoff"), to discuss his conditions. Christoff completed the necessary FMLA certification forms for Cuff to take a four-week medical leave from work. On December 9, 2009, Cuff e-mailed Trowbridge and Basham and told them about his need for FMLA leave. The next day, Trowbridge denied Cuff's request for leave because TSA did not employ 50 employees within 75 miles of Cuff's worksite. Later that month, Cuff decided that he needed to take the leave because his medical conditions were not improving. Cuff was granted a two-week personal leave, from December 31, 2009, until January 10, 2010. When he did not return to work thereafter, Cuff was fired.

The parties dispute some of Cuff's conduct while he was employed. Defendants contend that Cuff failed to follow doctor's orders in regard to his treatment, and that during the course of his employment, he took FMLA leave for non-existent doctor's appointments. Cuff denies most of these allegations. But he admits that he has not seen a psychologist as recommended by his doctor or taken the medication that necessitated his leave request. Additionally, Defendants contend that Cuff had an inappropriate relationship with a subordinate, lied during the course of a

company investigation of the matter, and encouraged the subordinate to lie. Cuff denies these allegations.

Ten days prior to his termination, Cuff moved from Carpentersville, a Chicago suburb, to his parents' home in Monticello, Wisconsin, which was about 180 miles away. Cuff planned the move in December 2009. Cuff contends that by then he expected to be fired, and if he had not been, he could have commuted to work at O'Hare.

## 2. Defendants' Corporate Structure

TSA and GoJet are regional airlines that operate flights as United Express. They are wholly-owned subsidiaries of TSH. In December 2009, as noted above, TSA had 33 employees with 75 miles of O'Hare, while GoJet employed 343 employees in that radius of the airport and TSH had none. The three companies use the same corporate headquarters in Bridgeton, Missouri, although they have separate offices.

The parties dispute the ownership of TSH, TSA, and GoJet. Cuff contends these entities are solely owned by Hulas Kanodia ("Kanodia") based on the testimony of Trowbridge, although he misattributes this testimony to Basham. Defendants contest this vigorously. They point to deposition testimony by Capt. Randall Zehnder, Director of Flight Operations for TSA, that TSA is a limited liability company that is fully owned by TSH. Additionally, Michaela Green, the Rule 30(b)(6) deponent for GoJet,

testified GoJet is a limited liability company wholly owned by TSH. This appears to be a distinction without much of a difference, however. The National Mediation Board findings in an unrelated proceeding that Defendants cite to (albeit in a footnote) in an effort to show that GoJet and TSA are not joint or integrated employers make plain that Kanodia owns TSH, although he is not involved in the day-to-day management of either GoJet or TSA. *See* Ex. 2 to Def.'s Mem. in Supp. of their Mot. for Summ. J., at 29.

According to the Wigmore affidavit, TSA and GoJet hold separate air carrier certificates issued by the U.S. Department of Transportation. TSA, a Delaware limited liability company, was founded in 1982. GoJet, also a Delaware limited liability company, was formed in 2004. Their aircraft are separately registered with the FAA under their respective names and are marked with stickers that indicate by which company they are operated. Pilots and flight attendants for the two companies have distinct labor representation. Pilots for TSA are not paid by GoJet, nor are they on TSA's seniority list. Employees for TSA and GoJet have unique identification badges.

Cuff disputes these facts solely on the basis that Wigmore's affidavit improperly supplements Defendants' Rule 30(b)(6) testimony, but does not point to specific facts that contradict Wigmore's statements. As such, the Court will accept them as undisputed. Additionally, as noted above, Wigmore contends that

both companies contract their crew payroll, crew planning, and legal services from TSH. Cuff points to Basham's slightly different testimony that the corporate defendants share accounting, legal, and payroll departments.

While the companies have separate lower-level managers, they share the same upper-level management. It is undisputed that Rick Leach is the President of all three companies. Wigmore is the Vice President and Chief Financial Officer for all three corporate defendants. Additionally, it is undisputed that Basham, who is employed by TSH as Vice President of Customer Service, oversees the in-flight, systems operations control, and employee travel departments for TSA and GoJet. Al Blosse ("Blosse"), the Vice President of Operations for TSH, provides oversight and guidance for the maintenance operations at both TSA and GoJet. The airlines, however, have their own maintenance directors who report to Blosse. Twana Maidwell, the Director of Systems Operations Control for TSH, supervises employees of both TSA and GoJet. Trowbridge, the Managing Director of Customer and Ground Services for TSH, directly supervises employees of all three entities. The companies also share customer service administrators, although GoJet has its own customer service manager, Haarmann. Additionally, although most of the companies' marketing is done by its partner airlines, they share marketing support staff.

TSH maintains personnel files for TSA and GoJet, and TSH's recruitment department performs services for all three companies, although Defendants maintain that the ultimate hiring decisions are made by the individual supervisors, not the TSH Recruiting Department. Cuff maintains that employees are routinely transferred between the three entities, citing several instances in which employees moved from one company to another. Defendants acknowledge that employees have worked for one company and then another, but maintain, again without citing to specific evidence in the record, that there are no direct transfers between companies. *See* Defs.' Resp. in Opp'n. To Pl.'s Statement of Facts, ¶ 25. Rather, Defendants contend, employees are treated as a new hire at the sister company. The companies file a joint tax return.

## II. <u>**ANALYSIS**</u>

### A. **Legal Standard**

A moving party is entitled to summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett* (1986). Because the court is considering cross-motions for summary judgment, it construes "facts and inferences therefrom in favor of the party against whom the motion under consideration was made."

*Five Points Rd. Joint Venture v. Johanns,* 542 F.3d 1121, 1124 (7th Cir. 2008).

## B. Cuff's Motion for Summary Judgment on his FMLA Interference Claim

To prevail on his FMLA interference claim, Cuff must show that his employer deprived him of an entitlement under the Act; he need not show any bad intent. *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006). He must show: (1) that he was eligible for the FMLA's protections; (2) his employer was covered by the FMLA; (3) he was entitled to take FMLA leave; (4) he provided sufficient notice of his intent to take leave; and (5) his employer deprived him of leave. *Id.* Cuff argues there is no genuine issue of fact as to any of these propositions, so he is entitled to summary judgment. There is no dispute that Cuff was eligible for FMLA leave (if his employer was covered by the Act), that he provided sufficient notice of his intent to take leave, or that his employer denied him leave.

However, Defendants contend that Cuff is not entitled to summary judgment (and in fact they are) because: (1) Cuff's employer is not covered by the FMLA; (2) Cuff was not entitled to leave because he did not have a serious health condition that rendered him unable to do his job; (3) Cuff cannot show that he took leave for its intended purpose; (4) Cuff cannot show that he was prejudiced by the denial of leave; and (5) After-acquired

evidence bars any recovery by Cuff for any FMLA violation. The Court will consider each issue in turn.

### 1. *Were the Defendants Covered by the FMLA?*

Department of Labor ("DOL") regulations provide for two instances in which some or all of the employees of two employers may be combined to meet the 50-employee threshold for the application of the FMLA. These are the "joint employment" test, 29 C.F.R. § 825.106, and the "integrated employer" test, 29 C.F.R. § 825.104(c)(2). *See Dey v. Marshall*, No. 01 C 9810, 2002 WL 773989, at *2 (N.D. Ill. April 29, 2002). The difference between the two tests has been explained this way: The joint employer test looks to whether there are sufficient indicia of an employee/employer relationship to justify imposing liability on the plaintiff's non-legal employer. *Engelhart v. S.P. Richards Co.*, 472 F.3d 1, 4 n.2 (1st Cir. 2006). By contrast, the integrated employer test allows liability to be imposed on the legal employer by arguing that another entity is sufficiently related so that its size may be attributed to the legal employer. *Id.* Status as an employer under the FMLA is a question of law. *Moldenhauer v. Tazewell-Pekin Consol. Commc'n Ctr.*, No. 04 C 1169, 2006 WL 3842086, at *7 (C.D. Ill. Dec. 29, 2006) (citing *Karr v. Strong Detective Agency, Inc.,* 787 F.2d 1205, 1206 (7th Cir. 1985)).

Cuff argues that both exceptions apply here, so he is entitled to summary judgment on his FMLA interference claim. Defendants

contend neither is applicable, so it is entitled to summary judgment on both counts. For the purposes of this motion, Defendants do not challenge Cuff's position that TSH and TSA are joint or integrated employers. However, because TSH had no employees within 75 miles of O'Hare Airport as of December 2009, both companies together would not be a covered employer under the FMLA. So, Defendants contend, the real issue is whether GoJet was a joint or integrated employer with TSA during the time period in question.

Cuff disagrees. He argues that although he was paid by TSA, there is evidence that he was actually employed by TSH. Trowbridge referred to him as such in an e-mail explaining his duties, and he was identified as such in an employee directory. Additionally, his replacement is an employee of TSH. To merely consider the relationship between TSA and GoJet ignores the role that TSH played in supervising Cuff and assigning him to act as a representative of GoJet. As such, the Court thinks it appropriate to look at the relationship between all three of the companies in order to determine if they are joint employers, rather than to focus solely on the relationship between TSA and GoJet.

### a. Joint Employer Relationship

A joint-employer relationship will be found to exist where the employers are separate legal entities who "have chosen to handle certain aspects of their employer-employee relationships jointly."

- 15 -

*Schubert v. Bethesda Health Grp., Inc.*, 319 F.Supp.2d 963, 970 (E.D. Mo. 2004). The DOL regulations governing this exception provide, in relevant part:

> (a) Where two or more businesses exercise some control over the work or working conditions of the employee, the businesses may be joint employers under FMLA. Joint employers may be separate and distinct entities with separate owners, managers, and facilities. Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:
>
> (1) Where there is an arrangement between employers to share an employee's services or to interchange employees;
>
> (2) Where one employer acts directly or indirectly in the interest of the other employer in relation to the employee; or,
>
> (3) Where the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 825.106(a).

The Seventh Circuit Court of Appeals, however, has found that this regulation does not provide much guidance in determining what constitutes a joint-employer relationship. *Moldenhauer v. Tazewell-Pekin Consol. Commc'n Ctr.*, 536 F.3d 640, 644 (7th Cir. 2008). Rather, the Seventh Circuit held that generally, for a joint employer relationship to exist, each alleged employer must exercise control over the working conditions of the employee, which

- 16 -

is a fact-specific inquiry. *Id.* Factors that are relevant to the analysis include whether the alleged employer: (1) had the power to hire and fire employees; (2) supervised and controlled employee work schedules or conditions of payment; (3) determined the rate and method of payment; and (4) maintained employment records. *Id.*

Cuff argues that TSH, TSA, and GoJet are joint employers because they have common ownership, operate under the same trade name, United Express, and share a headquarters and administrative staff. He also points to the undisputed evidence that he performed work for all three entities. Defendants, for their part, contend that TSA and GoJet had separate lower-level managerial staffs. Further, they contend that no agent of GoJet had the authority to hire or fire Cuff or to determine his rate of pay. Nor is there any evidence that GoJet employees were involved in the decision to fire Cuff, according to Defendants. Cuff responds that Basham, who had supervisory authority over GoJet employees, was involved in the decision to hire him, supervised him for a time, and directed him to perform tasks for GoJet. Trowbridge, who made the decision to fire Cuff, is an employee of TSH, but he also has supervisory authority over GoJet employees.

An examination of the factors outlined in *Moldenhauer* may appear to favor GoJet because it was TSH employees Basham and Trowbridge who supervised him and controlled his working conditions. Additionally, GoJet did not determine Cuff's rate of

- 17 -

pay or work schedule and did not maintain employment records. However, the Seventh Circuit in *Moldenhauer* acknowledged that these are not the only relevant factors in determining a joint-employer relationship, and declined to limit its review by adopting these factors as a test. *Moldenhauer*, 536 F.3d at 644 (noting that "it would be foolhardy to suggest that these are the *only* relevant factors, or even the most important). (emphasis in original).

Here, however, the language of the regulations is more helpful than it was in *Moldenhauer*. Cuff has presented evidence that GoJet, TSA, and TSH shared Cuff's services. Trowbridge, who wrote the e-mail in which he referred to Cuff as a TSH employee, testified that he assumed Cuff was a TSH employee until he looked through his file and determined that he worked for TSA based on his status forms. Trowbridge Dep. at 32:8-33:4. This illustrates the confusion over Cuff's employment status.

Regardless of whose payroll he was on, it is clear that Cuff was employed for the benefit of GoJet and TSA and did the same type of work for both airlines, in that he represented them in their dealings with United Express and the Department of Homeland Security. It also is clear that Defendants held Cuff out as their joint employee by representing him as such on Cuff's business card and in Trowbridge's email. As such, there was at least an implicit arrangement between Defendants to share his services. 29 C.F.R. § 825.106(a)(1).

- 18 -

Further, it also is clear that TSH, TSA, and GoJet were not "completely dissociated" with respect to Cuff's employment and "may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by, or is under common control with the other employer."  29 C.F.R. § 825.106(a)(3). Although GoJet disclaims any control over Cuff's working conditions or schedule, it obtained the benefit of his services, and TSA and GoJet were under common control in that they share the same upper management and owner.

Basham's testimony is enlightening in this regard.  Basham testified that Cuff represented both GoJet and TSA on behalf of TSH.  Basham Dep. at 93:21-94:5.  Part of his job responsibilities was to support Haarmann, the customer service manager for GoJet. *Id.* at 83:25-84:6.  Additionally, in explaining why Cuff's successor is a TSH employee, even though Cuff was (based on the name on his paycheck, at least) a TSA employee, Basham said, "We made the decision to put the support positions that support both companies where we can into a Holdings [TSH] position."  *Id.* at 81:9-13.

Defendants argue that the National Mediation Board's determination that GoJet and TSA are not a single transportation system, in an unrelated proceeding involving union representation, should be determinative of this issue.  However, the National Mediation Board is charged with resolving collective bargaining

disputes under the Railway Labor Act, not determining joint employment relationships for the purposes of the FMLA. *See Switchmen's Union v. NMB*, 320 U.S. 297, 302–03 (1943). Although the board considered similar issues as to the ownership and relationship between TSA and GoJet, its findings had nothing to do with Cuff's employment relationship with these entities, which is apparently quite different from their relationship with their pilots. Defendants present no case law standing for the proposition that the National Mediation Board's findings should be controlling here, and in fact do little to develop this argument. For the same reason, although Defendants take great pains to illustrate that GoJet and TSA were separate airlines with their own air fleets and pilots, this carries little weight in terms of assessing their relationship with Cuff. As such, the undisputed material facts show that GoJet, TSH, and TSA were joint employers, so Cuff is eligible for FMLA leave under that exception as well.

Additionally, Trowbridge, as Cuff's supervisor, can be held individually liable under the FMLA. The FMLA defines an employer as anyone who "acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)(I). Individuals may be held liable under the FMLA if: (1) the individual had supervisory authority over the plaintiff; and (2) the individual was at least partly responsible for the alleged violation. *Austin v. Cook Cnty.*, No. 07 C 3184,

2009 WL 799488, at *3 (N.D. Ill. March 25, 2009). Defendants' only argument against Trowbridge's individual liability hinges on this Court finding that Defendants were not joint or integrated employers. Because the Court has resolved that issue in Cuff's favor, it finds that Trowbridge is subject to the FMLA as a matter of law. Further, because the Court has found in favor of Cuff on the issue of whether the parties were joint employers, it sees no need to apply the integrated employer test.

### 2. *Was Cuff Entitled to Leave?*

Under the FMLA, an employee is entitled to up to 12 weeks of unpaid leave each year for a serious medical condition that makes the employee unable to perform the functions of his job. 29 U.S.C. § 2612(a)(1)(D); see *Darst v. Interstate Brands Corp.,* 512 F.3d 903, 908 (7th Cir. 2008). Here, Defendants do not dispute that bipolar disorder and Crohn's disease are serious health conditions, but they maintain that Cuff cannot show that he was unable to do his job because of these illnesses. *See Ames v. Home Depot U.S.A., Inc.,* 629 F.3d 665, 670 (7th Cir. 2011).

Defendants argue that Cuff did not need leave because of his illnesses, but rather because he did not follow his doctor's advice. Defendants point to evidence that after Cuff had been previously (and erroneously, they contend) approved for FMLA leave, Cuff stopped taking his medication. Cuff testified that he stopped taking his medication because he struck three cars on the way to

work, and went back to Christoff to try different drug therapies. Cuff Dep. at 257:4-17. Christoff testified that Cuff "did a lot of self-decision making" and "self-medicating" with the drugs he was prescribed. Christoff Dep. at 50:1-2. Further, Christoff testified that Cuff did not always follow his instructions, but that psychiatric illnesses can be difficult to treat and that there's no guarantee Cuff's condition would have improved had he followed doctor's orders. Christoff Dep. at 81:3-11.

Cuff contends that Defendants waived this issue by failing to challenge his certification for leave under the procedures set out in the FMLA. Employers may require that a request for leave be supported by a doctor's certification that provides: (1) the date upon which the serious health condition commenced; (2) the probable duration of the condition; (3) the appropriate medical facts within the knowledge of the health care provider regarding the condition; . . . and (4) a statement that the employee is unable to perform the functions of the position of the employee. 29 U.S.C. § 2613(b). In this case, Cuff submitted such a certification from Christoff.

Under 29 U.S.C. § 2613(c), an employer who questions the validity of a certification may require, at its own expense, a second opinion of a health care provider that it designates or approves. If the doctors reach conflicting opinions, the employer

can require the employee to obtain a third, binding opinion from a jointly selected health care provider.  29 U.S.C. § 2613(d).

The parties dispute whether this process is mandatory in order for an employer to challenge whether an employee was entitled to leave.  The Seventh Circuit has not decided this issue.  In *Darst*, 512 F.3d at 911, the court noted that other circuit courts of appeal found the procedures to challenge the certification process were not mandatory because the statute uses permissive language in providing that the employer "may" request a second opinion.  *See* 29 U.S.C. § 2613(c).  Regardless, the Seventh Circuit in *Darst* held that it did not have to decide this issue because the plaintiff could not prevail unless he could show that the employer's denial of leave interfered with his rights under the FMLA.  *Darst*, 512 F.3d at 911 (citing 29 U.S.C. §§ 2615(a)(1), 2617).

The debate over waiver, while interesting, misses the mark upon careful examination of Defendants' argument.  Here, Defendants are not seeking to challenge whether Cuff had a serious medical condition that rendered him unable to work.  They essentially are arguing that Cuff would not have had a qualifying medical condition had he been a better patient.  Defendants cite no case law standing for the proposition that a patient's failure to follow medical advice renders him ineligible for FMLA leave for that condition in the future.  Further, it amounts to pure speculation to assume that

had Cuff followed all of his doctor's orders, he would not have needed leave. For these reasons, the Court finds there is no genuine issue of material fact that Cuff was entitled to leave.

### 3. *Did Cuff Take Leave for Its Intended Purpose?*

Defendants additionally argue that Cuff did not take leave for its intended purpose, so they cannot be liable for FMLA interference. Defendants cite *Vail v. Raybestos Prods. Co.*, 533 F.3d 904, 909-10 (7th Cir. 2008) in support of their argument. In that case, an employee was fired for abusing her FMLA leave by working for her husband's business on days she had requested leave. *Id.* at 906. The Seventh Circuit noted that an employer is under no obligation to reinstate an employee who misuses leave, and that an employee who seeks to recover for interference in this circumstance must show that she took leave for its intended purpose. *Id.* at 909 (citing 29 U.S.C. § 2614(a)(1)). *Raybestos*, then, addressed the circumstances under which an employer is obligated to reinstate an employee who has taken leave.

Defendants point to evidence that after Cuff was denied leave, Trowbridge granted him a personal leave of absence from December 31, 2009 to January 11, 2010. Additionally, prior to this extended leave, Trowbridge gave Cuff nine days off between December 9 and December 31, 2009. During this time, Defendants contend, Cuff did not see a psychologist or take the medication recommended by his doctor. Cuff admits that he has never taken

this medication or seen a psychologist as recommended by Christoff. As discussed above, Cuff was not a perfect patient, and this may have given Defendants grounds not to reinstate Cuff had they given him leave. However, Defendants cite no case law standing for the proposition that their denial of leave may be justified by the employee's later conduct in regard to his health. Defendants also argue that Cuff misused FMLA leave that he previously had been given, but that goes toward Defendants' after-acquired evidence defense, rather than barring Defendants' liability in the first instance.

### 4. *Was Cuff Prejudiced by the Denial of Leave?*

Defendants further argue that Cuff was not prejudiced by any denial of leave, and therefore he is not entitled to relief.

The Supreme Court has held that while an employee may be entitled to both back and front pay as a remedy for FMLA interference, the employee can only recover compensation lost "by reason of the violation." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002) (citing 29 U.S.C. §§ 2617(a)(1)(A)(I)(I),(II)). Defendants point out that it is undisputed that Cuff was not terminated until January 11, 2010, yet Cuff moved out of his Chicago residence on January 1, 2010 and relocated to Monticello, Wisconsin, 180 miles away from his worksite.

As a preliminary matter, Cuff acknowledges that disputed issues of material fact require a trial on the issue of damages.

- 25 -

The issue of whether Cuff was prejudiced by the denial of leave relates to any damages he may have suffered, not Defendants' liability. *See Frazen v. Ellis Corp.*, 543 F.3d 420, 428 (7th Cir. 2008). Further, it is clear that they are disputed issues of fact as to whether Cuff could and would have continued working for Defendant after his move. Cuff points to the fact that his replacement actually lives in Wisconsin, as well as the fact that he did not move until twenty days after Defendants denied his request for leave. By that point, Cuff asserts, he needed to take leave, and therefore assumed that his employment would be terminated. At any rate, whether Cuff suffered any economic loss as a result of Defendants' denial of leave is an issue for a jury to determine.

### 5. Does After-Acquired Evidence Bar Recovery?

Under the after-acquired evidence doctrine, an employee's damages in an employment discrimination case are limited when there is evidence of wrongdoing that would have led to the employee's termination on legitimate grounds had the employer known about it. *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362–63 (1995). Defendants point to three incidents which they contend would have given them sufficient cause to fire Cuff.

First, they allege that Cuff lied to Trowbridge during a company investigation of an alleged sexual relationship between himself and a subordinate and contacted the subordinate against

Trowbridge's instructions in an effort to keep the relationship from being revealed. Defendants argue that based on this misconduct and pursuant to TSA's policy on sexual harassment, Cuff would have certainly been fired. Cuff denies that this alleged relationship occurred or that he asked the subordinate to lie about it. Defendants also claim that Cuff repeatedly lied to his supervisor when he told Trowbridge, on four occasions between November 2008 and July 2009, that he was taking FMLA leave to visit his doctor. Christoff's records do not reflect these visits, and Christoff testified that it would be highly unlikely for him to see a patient and for there to be no record of the visit. Cuff insists, however, that he made these visits.

Defendants also contend that, on another occasion, Cuff requested and received time off for a class reunion that he actually used for a job interview in Wisconsin. Finally, they contend that deposition testimony shows that Cuff was taking narcotic medication at such a level that it presented safety concerns and would have justified his firing. Cuff contends that he disclosed his medications to Defendants at the time of his employment, and that none of them prevented him from operating heavy machinery.

There are several problems with Defendants' argument. First, as noted above, Cuff denies Defendants' allegations of misconduct. Additionally, Defendants have presented no evidence of their

policies that Cuff allegedly violated or evidence supporting their position that these violations would have resulted in Cuff's termination. The after-acquired evidence inquiry focuses on an employer's actual practices, so it is not enough for Defendants to contend they would have been justified in firing Cuff; they must show that they actually would have done so. *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1047–48 (7th Cir. 1999). Finally, the after-acquired evidence doctrine limits an employee's damages, but does not affect the determination of liability, so the evidence presented by Defendants is not a bar to Plaintiff's motion for summary judgment on his FMLA interference claim. *See Rodriguez v. City of Chicago*, 08 C 4710, 2011 WL 1103864, at *14 (N.D. Ill. March 25, 2011).

For the reasons stated herein, the Court finds that the undisputed material facts show that Cuff is entitled to summary judgment on his FMLA interference claim.

## C. Defendants' Motion for Summary Judgment on Both Counts

Further, for the same reasons, Defendants are not entitled to summary judgment on either count of Cuff's complaint. The undisputed material evidence shows that Defendants were subject to the provisions of the FMLA and that Cuff was eligible for leave. The other issues raised by Defendants, that Cuff was not prejudiced by the denial of leave or that after-acquired evidence bars Cuff's

recovery, go toward damages, and the factual issues discussed above bar summary judgment on these issues.

### III. <u>CONCLUSION</u>

For the reasons stated herein, the Court rules as follows:

1.   Plaintiff's Motion to Strike Gerald Wigmore's Affidavit and Other Material [86] is denied;

2.   Plaintiff's Motion for Summary Judgment on Count I of his Complaint [74] is granted; and

3.   Defendants' Motion for Summary Judgment [79] is denied.


**IT IS SO ORDERED.**


_____
     Harry D. Leinenweber, Judge
     United States District Court

**DATE:** 10/6/2011

- 29 -