```
 1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   DARREN CUFF,                    )   Docket No. 10 C 1349
                                     )
 4                  Plaintiff,       )   Chicago, Illinois
                                     )   February 27, 2012
 5             v.                    )   9:00 a.m.
                                     )
 6   TRANS STATES HOLDINGS, INC.,    )
     TRANS STATES AIRLINES, GOJET    )
 7   AIRLINES, and ED TROWBRIDGE,    )
     Individually,                   )
 8                                   )
                    Defendants.      )
 9

10                          VOLUME 1-A
                  TRANSCRIPT OF PROCEEDINGS - Jury Trial
11       BEFORE THE HONORABLE HARRY D. LEINENWEBER, and a Jury

12
     APPEARANCES:
13
     For the Plaintiff:      CAFFARELLI & SIEGEL LTD by
14                           MR. ALEJANDRO CAFFARELLI
                             MR. BRADLEY S. MANEWITH
15                           MR. DAVID ZEHNER
                             180 North Stetson
16                           Suite 3150
                             Chicago, Illinois 60601
17
     For the Defendants:     MR. DAVID J.A. HAYES III
18                           MS. LESLIE ELLEN CAVENDER
                             MS. ALLISON SCHULTZ
19                           Trans States Holdings, Inc.
                             11495 Navaid Road
20                           Bridgeton, Missouri  63044

21

22   Court Reporter:         GAYLE A. McGUIGAN, CSR, RMR, CRR
                             Federal Official Court Reporter
23                           219 South Dearborn, Room 1944
                             Chicago, Illinois 60604
24                           312-435-6047
                             Gayle_McGuigan@ilnd.uscourts.gov
25
```

I N D E X

                                                        PAGE

JURY SELECTION                                           29


OPENING STATEMENT - MR. CAFFARELLI                       70


OPENING STATEMENT - MR. HAYES                            82

1    (In open court outside the presence of the jury.)

2        THE COURT:  Good morning.

3        THE CLERK:  10 C 1349, Cuff versus Trans States

4    Holdings.

5        THE COURT:  The plaintiff filed seven motions in

6    limine.  Defense none, as I understand it.

7        The first motion, to bar evidence he consulted with

8    attorneys.

9        Any objection to that?

10       MR. HAYES:  Well, yes, your Honor.

11       The evidence about the consultation with attorneys,

12   Darren has previously waived that.

13       He sent a copy of the e-mails about his consultation

14   with attorneys to us while he was still employed with us.

15       He also told his roommate Angela at that time.

16       We think that that's very relevant about his decision

17   never to return to work as part of the calculation of the

18   damages in this case.

19       MR. CAFFARELLI:  Your Honor, first of all, the e-mail

20   that was copied to them, that wasn't us.  That was some other

21   attorney that he contacted prior to retaining us.  And I don't

22   know that he told Mr. Kenny that --

23       THE COURT:  Here's what I'll do:

24       I'll grant it except that you may question him as to

25   letters that mention that he contacted an attorney.  All right?

1          MR. HAYES:  Thank you, your Honor.

2          MR. CAFFARELLI:  What about the -- we have the exhibit

3     that's attached to the motion.  Specifically, there's this

4     e-mail to his doctor.

5          THE COURT:  Which one?  First motion, that would be --

6          MR. CAFFARELLI:  The first one --

7          THE COURT:  I don't have an e-mail.  There's no --

8     wait a minute.  There's no e-mail attached to mine.

9          MR. CAFFARELLI:  There's no exhibit to that first

10    motion in limine?

11         THE COURT:  Well, there's Exhibit A, which is some

12    transcript.  I think that may be -- well, there's an Exhibit A,

13    transcript.  Anyway --

14         MR. CAFFARELLI:  It's Exhibit B to the motion.

15         THE COURT:  All right.  To Darren Cuff from -- you

16    may -- he may question him as to that.

17         MR. HAYES:  Thank you, your Honor.

18         THE COURT:  He indicates what the lawyer -- advice he

19    gave, so it's not -- waive -- would have waived the privilege.

20         Number 2, to limit or exclude plaintiff's medical

21    records and conditions.

22         MR. HAYES:  Yes, your Honor.  We object in its

23    entirety.  The whole basis, at least in part, of our defense in

24    this case is that Mr. Cuff would be unable to return to work.

25         Under the standard of the FMLA, to be entitled to any

1   damages, he's going to have to prove he could have come back to

2   work at some point.

3          And the medical evidence we believe is overwhelming

4   that shows he would never have been able to come back.

5          THE COURT:  Yes, but my understanding is there's no

6   expert witness.

7          MR. HAYES:  No, we don't feel like we need an expert.

8   We're calling his own doctor who testified during his

9   deposition that Darren is addicted to narcotics, as well as a

10  variety of other things.

11         We just think that, you know, that on its face should

12  be enough evidence without any additional need for experts or

13  confusion because he couldn't have come back to work.

14         MR. CAFFARELLI:  Your Honor, I disagree.

15         What they're trying to do is re-litigate the issue of

16  whether or not he was qualified for FMLA in the first place,

17  which they tried to do at the motion for summary judgment

18  stage.

19         And as we argue in the motion, if you don't do that at

20  the certification phase, you can't go back and try to do that

21  again that he somehow was ineligible for FMLA leave.

22         As to this addiction to narcotics, it's a gross

23  misrepresentation of what the doctor said.

24         That's why, even if it's somehow relevant under

25  Rule 403, it should be excluded.

1          THE COURT:  Well, we'll see what the doctor has to

2     say, if he's going to testify.

3          MR. CAFFARELLI:  Well, you know, the issue is that

4     it's going to come up on plaintiff's cross-examination

5     beforehand.

6          And this motion is kind of tied in with the narcotic

7     prescription drug use motion as well.

8          THE COURT:  All right.  Okay.

9          Well -- let's see, the next one is use of alleged

10    abuse of prescription narcotics.

11         MR. HAYES:  Your Honor, I -- we object to this, the

12    same reason.

13         I mean, we want to present evidence of Darren's

14    inability to return to work as well as his misrepresentations

15    during his employment about his conditions.

16         THE COURT:  Well --

17         MR. HAYES:  We never had a chance during his

18    employment -- plaintiffs argue that we should have done this

19    pre-certification test.

20         We never did a pre-certification test, as your Honor

21    may recall, because we didn't believe Mr. Cuff was eligible for

22    FMLA because we didn't have the prerequisite number of

23    employees within 75 miles, so we never even got to the question

24    of should we seek another doctor or --

25         THE COURT:  Well, you must show -- defendant must show

1    they would have fired someone had they been apprised of the

2    evidence.

3          The presentation of policies and procedures were

4    inadequate, at least so far, as to the summary judgment.

5          Additionally, the Seventh Circuit has said that mere

6    policy showing the company could have fired someone for a

7    transgression is not the same as showing that they would have

8    fired him.

9          And, therefore, to the extent you can show that you

10   have fired employees for similar transgressions, such as --

11   what would be a comparable thing, then otherwise I don't think

12   you can bring that in.

13         MR. HAYES:  As to the motion in limine for the

14   narcotics evidence, the prescription?

15         THE COURT:  Right.  Right.

16         Now, if you can show that you fired people for

17   identical or very, very similar procedures for transgressions,

18   then I think you can argue that you would have fired plaintiff.

19   But just because you could have fired him doesn't -- as I read

20   the Seventh Circuit law, which is *Sheehan versus Donlan Corp.,*

21   170 (sic.) F.3d 1039 --

22         MR. HAYES:  Well, I understand, your Honor, but I

23   guess since we're just talking about the damages, Section 2617

24   of the FMLA provides that he can't recover unless he shows he

25   was prejudiced by the violation, and specifically then can only

1    recover for damages in time periods which he otherwise -- or

2    when he otherwise couldn't return to work.  And that's what we

3    want to establish.

4          MR. CAFFARELLI:  But, Judge, that doesn't affect the

5    analysis.

6          There's two ways he would be prejudiced:

7          Either he physically couldn't return to work --

8          THE COURT:  We're talking here about whether you would

9    have fired him because of after-learned information.

10          Now, if you show that your after-learned information

11    had in the past been sufficient to fire some other similarly

12    situated employee, then it would be relevant.

13          Otherwise, to me, under Seventh Circuit case law, it's

14    not relevant.

15          So the motion is granted unless you can establish

16    after similar situated people.

17          I haven't gone in great detail of what your witnesses

18    are.  But if you can, then you could bring that in; if you

19    can't, then you can't.

20          Now, the next one, bar evidence of plaintiff's arrest

21    and suspicion of driving on intoxicating medicine.

22          Any objection to that?

23          MR. HAYES:  Yes, your Honor.  We believe, again, it

24    goes to his truthfulness.  It's not the actual arrest, though

25    that was related to the narcotics.  It's his failure to tell us

1    what was going on.  He repeatedly lied to his employer.

2           THE COURT:  I'm going to grant that.  It seems to me

3    that the arrest is inadmissible as impeachment, unless

4    conviction -- or unless the bad act itself reflects honesty --

5    or dishonesty.  And I don't think driving while intoxicated

6    does that.

7           Now, whether or not he should have told you is another

8    matter.  But, anyway, he wasn't convicted.  The charges were

9    dropped, as I understand it.

10          So that's granted.

11          MR. HAYES:  Well, your Honor, can I just ask for

12   clarification?

13          If our witness testifies that Darren told him or her a

14   different story about what happened and then related that to

15   the employer, can we revisit that issue?

16          THE COURT:  No, I don't think so because that's --

17   you're creating a strawman then.  That's something that ...

18          Let's see, plaintiff's motion five, to bar or limit

19   the testimony of Angela Giacchetti.

20          MR. HAYES:  Again, your Honor, obviously we object.

21   Miss Giacchetti was his roommate.  We don't intend to have her

22   testify about any medical opinions or anything, just her

23   observations of his behavior, his repeated misrepresentations

24   of where he was, which is a reason we would have terminated his

25   employment had we known, that we didn't discover until after

1    the discovery in some parts of this case.

2           She's one of our witnesses that's going to talk about

3    when Darren would tell people that he was somewhere when he was

4    not there, using his cell phone to pretend he was in one

5    location when he was in other locations.

6           She also has direct evidence about his medical

7    condition, and, again, both disregarding his doctor's advice,

8    not following up with his doctor's advice, which caused his

9    condition to be, as his doctor put it, his own fault for

10   self-medicating, which would have alleviated this entire

11   situation.

12          THE COURT:  Well -- go ahead.

13          MR. CAFFARELLI:  On those two issues, on the

14   medication, I mean, she's not his doctor.  She doesn't know

15   what medicines were prescribed to Darren.

16          THE COURT:  Well, I agree with that.  I'm not going to

17   let her testify as to anything related to medical.

18          Now, if he -- if she can testify that he wasn't --

19   that he was taking sick days or not showing up to work and it

20   was obvious that he was doing other things, like mowing the

21   lawn and stuff like that, then that might be relevant.  But I'm

22   not going to let her testify that he didn't take his medicine

23   or took too much medicine or anything like that.

24          MR. CAFFARELLI:  Or his medical condition.  He suffers

25   from bipolar.

1              THE COURT:  Yeah, medical condition.  She's not a

2      doctor, so she can't testify to that.

3              Number six, to bar the testimony of Alicia Gabriel.

4              MR. HAYES:  Again, we object, Your Honor.

5              Miss Gabriel is an employee of United Airlines.

6      Miss Gabriel is the one who related to us that Mr. Cuff was

7      having a sexual relationship with a direct subordinate.

8              THE COURT:  I mean, how does she know that?  Did she

9      witness --

10             MR. HAYES:  He told her.  Her testimony will be that

11     he told her.

12             And it's directly -- I mean, that's how we found out

13     about it.

14             Without her testimony, the jury will be misled into

15     believing that we were somehow trying to persecute Mr. Cuff,

16     that somebody was out to get him right in the time when all

17     this FMLA, when, in fact, it was an employee of a company,

18     another company, that came forward after this and said, hey, by

19     the way, he's doing this bad thing that triggered us to start

20     investigating it, not any anti-FMLA animus.

21             Not allowing this evidence would be highly prejudicial

22     as it's going to leave the jury with the belief that we were

23     out to get him.

24             And this evidence clearly shows that we were advised

25     by a third party of his behavior.

1        MR. MANEWITH:  Your Honor, how they found out is --

2  it's just not relevant.  It's a matter of they're trying to

3  argue -- making it into a side show.  Whether or not he was

4  truthful or not truthful in this investigation, while we

5  question the relevancy, we haven't filed a motion, but the

6  start and how it was initiated, it just doesn't go to this

7  case.

8        (Counsel conferring.)

9        THE COURT:  Do you have comparables to show that

10  subordinate -- other -- other employees were fired for having

11  relationship with subordinates?

12        MR. HAYES:  Yes, your Honor.

13        MR. MANEWITH:  Your Honor --

14        MR. HAYES:  For purposes --

15        THE COURT:  Where is the source of the evidence of

16  this relationship?  From the plaintiff?

17        MR. HAYES:  From -- of the plaintiff and the other

18  party.  Mr. Aniballi is on our witness list.  And he'll

19  testify, as he did in his deposition, about their prior sexual

20  relationship.

21        MR. CAFFARELLI:  But the comparables, your Honor, they

22  did not have a sexual relationship.  They had a one-night stand

23  years before Mr. Aniballi ever worked at the company.

24        I don't think there's going to be any comparable where

25  the company terminated somebody because they had a one-night

1    stand with somebody who wasn't even an employee.

2              THE COURT:  Was this a one-night stand or what?

3              MR. CAFFARELLI:  This is a one-night stand.

4              MR. MANEWITH:  Which is what Mr. Aniballi alleges.

5              MR. CAFFARELLI:  And Mr. Aniballi will testify that

6    this was a one-night stand that happened years before he even

7    became an employee.  This isn't a matter of him having a sexual

8    relationship --

9              THE COURT:  Wait a minute.  This relationship occurred

10   while --

11             MR. MANEWITH:  Before Mr. Aniballi was even an

12   employee, so he wasn't even a subordinate at the time.  And he

13   will testify --

14             THE COURT:  If that's the case --

15             MR. HAYES:  Well, I don't think the evidence is that

16   it was years before.  It was some time period --

17             THE COURT:  Well, if he wasn't -- I mean, he had to be

18   a subordinate at the time he had the -- like Clinton and

19   Monica.

20        (Laughter.)

21             MR. HAYES:  Your Honor, I appreciate that.  The

22   problem, though, again, it goes to our after-acquired evidence.

23             THE COURT:  No.

24             MR. HAYES:  Mr. Cuff hired Mr. Aniballi and

25   misrepresented to us, we believe because of that sexual

1    relationship, his qualifications.  He didn't meet the minimum

2    qualifications for the job.

3            THE COURT:  I'm granting that.

4            Plaintiff -- let's see, bar evidence plaintiff was not

5    terminated or that he should have come in to work on

6    January 11th.

7            MR. CAFFARELLI:  That's the last one.  Right.

8            THE COURT:  Yeah.

9            MR. CAFFARELLI:  I mean, the basis of that motion is

10   because there appeared to have been an argument that Mr. Cuff

11   wasn't terminated or he should have made more efforts to come

12   in.  And that argument we believe is contrary to the FMLA that

13   he should have, you know, notwithstanding his rights under the

14   law, should have made some additional effort to come in that he

15   didn't make.  And so we're just seeking to bar any evidence or

16   inference that he didn't do enough under the FMLA because the

17   Court has already looked at the FMLA and ruled on that.

18           MR. HAYES:  Well, your Honor, again, it goes to the

19   prejudice issue against us on damages.

20           Mr. Cuff was denied FMLA at the time, long before this

21   Court made the ruling that we were mistaken about that.

22           He was instructed to come to work on the 11th.  We had

23   given him time off -- not FMLA, just time off -- and told him

24   he had to come back on the 11th.  He wouldn't even return our

25   calls, so the company had no choice but to terminate him.

1    THE COURT:  I thought I saw an e-mail in there that

2    said that I can't do it on that particular day without -- but

3    I'll --

4    MR. HAYES:  That's true.  There's another e-mail where

5    he says he thought he was terminated on the 4th, so just send

6    me my final paycheck, why should I even come in.

7    Again, we think it prejudices our damages case if we

8    can't explain to the jury that he wouldn't come in and even

9    talk to us about the situation.  He had already started his

10   litigation process.

11   MR. CAFFARELLI:  Well, you know, we disagree because

12   it was clear from the company's e-mails that they weren't going

13   to give him the FMLA he requested.  He requested four weeks.

14   And what they wanted to talk about --

15   THE COURT:  All right.  I think it's probably

16   admissible on good faith but not -- so I'll overrule the

17   objection on that.  But limit it to good faith -- or good faith

18   in denying him the care.

19   Now, as far as a statement of the case, I like to read

20   a statement of the case to the jury.  I've sort of fashioned

21   one.  Let me read it to you.

22   The case involves the Federal Family and Medical Leave

23   Act.

24   Plaintiff requested benefits, which were denied by

25   defendant, contending -- who contended that the Act didn't

1  apply to it.

2          The Court has ruled that the Act did apply to

3  defendant and that plaintiff was unlawfully denied leave.

4          Plaintiff requests damages as a result of lost wages.

5          Defendant contends that plaintiff did not intend to

6  return from leave and that subsequently-obtained information

7  shows that they would have discharged plaintiff for cause.

8          MR. HAYES:  No objection.

9          THE COURT:  Is that all right for both sides?

10         MR. CAFFARELLI:  Sounds right to me.

11         THE COURT:  All right.  I'll explain to the jury that

12 this is my interpretation and it's not binding on either side,

13 just for purposes of jury selection.

14         MR. CAFFARELLI:  Your Honor, actually -- well, this

15 may have more to do with jury selection, but Mr. Cuff is gay,

16 and I do have a concern that somebody might not like that or

17 might be prejudiced against somebody because of their sexual

18 orientation.

19         I just want to make sure that to the extent you go

20 into voir dire that that issue is covered so that anybody might

21 have --

22         THE COURT:  I thought that I excluded -- how is it

23 going to come up that he's gay?  I excluded the relationship.

24         MR. CAFFARELLI:  Yeah.

25         THE COURT:  I granted --

1          MR. CAFFARELLI:  If it's not --

2          THE COURT:  I mean, I don't really want to go into it

3    unless ...

4          MR. CAFFARELLI:  Yeah.  Okay.  If --

5          MR. MANEWITH:  If it's not going to come in, we don't

6    need to go into it --

7          MR. HAYES:  Your Honor, then I guess that you'd have

8    to additionally bar any evidence that they would put on about a

9    conversation or conversations with an employee named Nick Reya

10   (phonetic).

11         I'm not sure if they're planning on talking about

12   that, but if they were --

13         THE COURT:  Apparently they're not.

14         All right.  The voir dire.  I'll conduct the voir

15   dire.  And I will give you -- get from them background

16   information as to their education, employment, age, and so on

17   and so forth, children, spouse's employment.

18         And whether they've ever applied for leave under

19   Federal Family Medical Leave Act or any other provision such as

20   the Leave Act, like under a union contract and so forth,

21   whether they were ever denied leave, and whether they ever

22   supervised other employees where they would -- where they

23   supervised employees, and if they ever were called upon to

24   consider either granting or denying leave.

25         Then I'll find out whether they've been on jury duty

1    before, whether they've been involved in lawsuits before, and

2    whether they're familiar with any of the parties, whether they

3    will follow the law, any reason they couldn't be fair.

4            Anything else you want covered?

5            MR. HAYES:  Your Honor, I'd request that the Court ask

6    them if they've ever sued a commercial airline before.

7            THE COURT:  I was going to ask them if they've ever

8    been involved in a lawsuit.

9            MR. HAYES:  Any lawsuit.

10           THE COURT:  That will cover, presumably, whether they

11   ever sued an airline.  I would doubt that they have.

12           Usually what happens is you'll find out that when they

13   were a kid, they were in an accident and a claim was made and

14   was resolved and so forth.

15           MR. HAYES:  No, obviously that would be fine.

16           THE COURT:  Anything else?

17           MR. CAFFARELLI:  I just want to be clear, your Honor,

18   because I don't want to overstep our bounds because, you know,

19   having prepared for the assumption that everything is coming

20   in, we need to do some quick adjustments here.

21           On the -- in the opening, as to the direct testimony,

22   I think it would be appropriate to tell the jury -- to give

23   them some background that he had been diagnosed with Crohn's

24   disease and bipolar.  That was the reason for the FMLA.  And

25   that's pretty much all we intended to do.  Crohn's disease,

1    this is what Crohn's disease is.  Bipolar, this is what bipolar

2    is.  He had been approved for the FMLA.  But we weren't

3    intending to go into major detail into, you know, how that

4    affects him on a day-to-day basis or any of that stuff.  It was

5    just describe the conditions as background.

6          I don't want to then open the door for an argument

7    that because we discussed the conditions, the fact that he had

8    these conditions, that somehow now all the medical records

9    become relevant.

10          I'm happy not to discuss the conditions and just say,

11   look, this is an FMLA case and you don't need to worry about

12   what he had.  The point is he had it.

13          But it's hard -- it's hard -- I guess we need to

14   revisit all the exhibits because some of the exhibits do

15   reference that.

16          They're not the medical records.  We sought to exclude

17   the medical records and the medical arguments.

18          But I just wanted the Court's perspective on maybe

19   just raising the fact that he had these conditions without --

20   without opening the door to then bringing the medical

21   conditions into question during the trial.

22          MR. HAYES:  Well, your Honor, I guess, you know --

23          THE COURT:  Let me ask -- let me ask this:

24          It's my understanding they denied him medical leave

25   because defense didn't believe that -- that they -- that it

 1   applied to them.

 2            MR. HAYES:  Correct.

 3            MR. CAFFARELLI:  Right.

 4            THE COURT:  Not that he didn't deserve it if it did

 5   apply to them.

 6            MR. HAYES:  That's correct, Your Honor.

 7            But my understanding is plaintiff's argument is that

 8   we can't argue any of the medical issues of whether or not he

 9   was eligible or helping or doing any of the things related to

10   the medical because we didn't ask it at the time.

11            But at the time, we couldn't have asked it.  We told

12   him he was not eligible because there weren't enough employees

13   within 75 miles of Chicago, so we never went to the

14   pre-certification phase.

15            So it would be prejudicial if we have no ability to

16   discuss that now.

17            I mean, we're going to call his doctor.

18            THE COURT:  Well, I think he can testify without -- I

19   mean, he -- just saying that he had symptoms and so forth that

20   made it very difficult for him to work so he needed time off,

21   and without going into detail as to specifically what was wrong

22   with him.

23            MR. CAFFARELLI:  Okay.  Well, my other concern is if

24   somebody -- if some -- you know -- well, so you're saying that

25   he would just describe he had a medical condition and he needed

1    to be out.  My concern is the jury is going to start to

2    speculate that he had HIV or something that also might

3    prejudice them, which he doesn't.

4            MR. HAYES:  Then they're free to have him discuss his

5    medical condition.  If he thinks it will bring up prejudice,

6    they should explain to the jury that that's not what he has.

7            THE COURT:  I guess to the extent that -- one of my

8    colleagues has Crohn's disease, so I have some modicum of

9    understanding of what it is and what was -- his other problem

10   is?

11           MR. CAFFARELLI:  Bipolar.

12           THE COURT:  Bipolar.

13           MR. CAFFARELLI:  And so the only thing we were going

14   to do is --

15           THE COURT:  I think those are probably common enough

16   terms that he can testify that this is what I have, and then

17   say that his symptoms were overwhelming him or whatever.

18           I'm not going to tell you how to try the case, but,

19   you know, as of right now, his doctor is going to testify for

20   the defense, correct?  Is that your intention?

21           MR. CAFFARELLI:  I guess they intend --

22           MR. HAYES:  He's on both of our lists.  They object to

23   us calling him, but they have him on their list.

24           MR. CAFFARELLI:  We have him as a "may call" and we

25   did not intend --

 1          THE COURT:  It might be the easiest thing for you to

 2    call him.

 3          MR. CAFFARELLI:  Well, we didn't intend to call him

 4    because I don't know what he would testify to, other than going

 5    into --

 6          THE COURT:  All right.  Well, again, I'm not going to

 7    tell you how to try the case.

 8          I would say that your guy should be competent to

 9    testify why he felt he needed leave, and he went to them and

10    they said you're not going to get it because the law doesn't

11    apply to us, or whatever they told him.  And because I needed

12    the leave, I took it anyway.  And then they can bring out that

13    he contacted a lawyer and the lawyer told him, yeah, you're

14    entitled to it or whatever, and so he took the leave with the

15    results that they terminated him or whatever, you know, the

16    evidence will show.  And then that's about all I can tell you.

17          MR. CAFFARELLI:  But -- okay.  But then just to be

18    clear, on motion in limine two and three, the medical and the

19    narcotics, that we're not talking about the narcotic --

20          THE COURT:  Narcotics is definitely out.  Sexual

21    history is out.  I don't see where that's particularly

22    relevant.  I don't think it has any connection to Crohn's

23    disease or bipolar illness.

24          MR. HAYES:  Well, your Honor, the only thing I would

25    say about that is --

1          THE COURT:  Now, if his doctor would say that he was

2   never able to return to work, then -- I mean, I don't know what

3   he's going to testify to, but if he would say he could never

4   return to work, then that would probably -- might -- that would

5   be a defense, I suppose.  I don't know what his doctor would

6   say.

7          MR. CAFFARELLI:  What the doctor is going the testify

8   to is he didn't always follow my instructions.  I would tell

9   him to take this medication.  And sometimes he would take it,

10  sometimes he wouldn't.  And he could have been a better

11  patient, essentially.  But not that he wasn't able to return to

12  work.

13         MR. HAYES:  We think that's very relevant, your Honor.

14         The jury, who is going to be deciding damages against

15  us, should know that Darren didn't follow his doctor's

16  instructions.  It would have got him back to work --

17         THE COURT:  How many people actually always do to a

18  tee?  We would all floss every night if we followed

19  instructions.

20         I had a juror tell me that once.  I said one of the

21  questions was -- I forget what the issue was, but have you ever

22  disregarded a medical provider's instructions?  He said, yeah,

23  I don't floss every night.

24         So, I mean, there's, you know, there's a de minimus

25  aspect, too.  I mean, I don't know what -- you've deposed him

1    or you've talked to him, I haven't.  Anyway, that's about the

2    best I can do with it before the trial.

3              MR. HAYES:  Very good, your Honor.  Thank you.

4              THE COURT:  We're going to get the jury.

5              By the way, I probably didn't go over this.

6              We'll pick seven jurors.  This case will take, what,

7    two to three days?

8              MR. HAYES:  Yes.

9              MR. MANEWITH:  Yes.

10             THE COURT:  Yeah.  So you will get -- each side gets

11   three peremptories.

12             MR. HAYES:  Your Honor, if I could, I'd like to

13   revisit that issue.

14             Under 47(b), we have four defendants in this case, and

15   I would request six --

16             THE COURT:  I think they're fungible, aren't they?

17             MR. HAYES:  Well, the comments to the rules talk about

18   each defendant getting three.  And then at the Court's

19   discretion, there's a consolidation.

20             Our request for six peremptory challenges is three in

21   total for the three corporate defendants and three for

22   Mr. Trowbridge, the individual defendant.

23             THE COURT:  I'm limiting each side to three.  Period.

24             MR. HAYES:  Thank you, your Honor.

25             THE COURT:  And you'll exercise them, unless you

1    decide you want to do it differently -- and for 26 years I've

2    done it this way -- that you exercise them in writing, give

3    them to me, and I will exclude the juror without attribution.

4         And if you -- since you're going to do it

5    simultaneously -- and if you don't -- for example, if the seven

6    jurors you have no -- let me start out -- here's how I'll do

7    it:

8         I'll put seven jurors in the box.  There's seven seats

9    in the front row.  I'll question them all.  And then I'll say,

10   okay, give me your choices.

11        Now, if you wanted to excuse someone for cause, then

12   we'll have a sidebar.

13        To exercise your peremptories, you'll write down on a

14   piece of paper, plaintiff strikes Juror Number 3, defense will

15   write strike 6 and 7 or whatever it is.

16        You'll give them to me.  And then I will say jurors 3,

17   6, and 7 are removed.  Replace them.

18        But one thing you should be aware of, I will swear in

19   those who aren't challenged.  I don't permit back-strikes.

20        So, like I said, we'll have seven, plaintiff strikes

21   3, defendant 6 and 7.  At that point you both -- if plaintiff

22   exercises one of their three and defense two of the three, we

23   replace those three, and then go through the same process.

24        And in the event you both strike the same juror, which

25   is a possibility, the first time that happens, it's chargeable

1    to the plaintiff.  The second time, it's chargeable to the

2    defendant.

3              Example, plaintiff strikes Jurors 1 and 2.  Defense 2

4    and 3.

5              At that point, plaintiff has exercised two

6    peremptories of his three, and defense has exercised one.  So

7    we replace those three.  You both strike replacement Juror

8    Number 1.  Now, at that point, defendant has exercised two and

9    plaintiff two.

10             MR. HAYES:  Understood.

11             THE COURT:  And then if it happens again, the next

12   time, it's -- and if you don't have -- if you're satisfied with

13   all the jurors and don't wish to exercise a peremptory, don't

14   stand up and say they're all fine.  Write down on a piece of

15   paper zero strikes or no -- we accept or whatever, so that you

16   don't leave -- the purpose is -- or one of the purposes is so

17   that the strikes are done without -- so that the jurors don't

18   know who struck them.

19             MR. CAFFARELLI:  So we should both bring you a paper

20   even if we have no strikes?

21             THE COURT:  Right.  Write down none or, you know,

22   Juror 1, Juror 2.

23             MR. HAYES:  Just to be clear when you say back-scratch

24   (sic.) -- we strike one each from the first seven panel or five

25   remaining -- you swear those five in --

1          THE COURT:  I swear those five in.

2          MR. HAYES:  -- those are done.  We have --

3          THE COURT:  They're done.  They're part of the jury.

4    So then we replace the other two.

5          MR. HAYES:  Thank you.

6          THE COURT:  That's the way I've done it now for 26

7    years.

8          MR. HAYES:  No objection.

9          THE COURT:  I'm open to suggestions.

10         MR. HAYES:  No, sir, that's fine.  I just wanted to

11   make sure I understood.

12         THE COURT:  Yeah.  So without anything else, I'll send

13   Miss Parker down to get the jurors, and we will start -- we'll

14   pick the jury.

15         Usually it shouldn't take more than a half hour or 40

16   minutes.  Then we'll have opening statements probably this

17   morning, and then start evidence this afternoon.

18         MR. CAFFARELLI:  Jury instruction conference is after

19   the evidence --

20         THE COURT:  Pardon?

21         MR. CAFFARELLI:  The jury instruction conference is

22   after the evidence has come in?

23         THE COURT:  Well, what we'll probably do is have them

24   tomorrow night after court.  Unless you figure you might finish

25   tomorrow, and then we might have it tonight.  But -- I have

1    a -- when I have a jury instruction conference, the way I do it

2    is, unless there's objection -- and, again, I've never had an

3    objection, but it doesn't mean I wouldn't entertain one -- is I

4    have actually two conferences:

5           One informal one in chambers in which we go over all

6    the instructions and I give an indication how I intend to rule;

7    and then the next available time -- I don't have the court

8    reporter back there.

9           The next available time, we go on record, and then I

10   go through exactly what we talked about and I decided in

11   chambers, and then you can put on record whatever objections

12   you have.

13          MR. MANEWITH:  Your Honor, do you instruct the jury

14   before or after closings?

15          THE COURT:  Before -- no, after closing -- last thing

16   they get is the instructions.

17          MR. MANEWITH:  Okay.

18          MR. HAYES:  Very good.

19          THE COURT:  So plaintiff will give final argument,

20   defense final argument, plaintiff rebuttal, my instructions,

21   swear in the bailiff, and out they go.

22          MR. MANEWITH:  Okay.

23          MR. HAYES:  Very good.

24          THE COURT:  Any questions?

25          MR. CAFFARELLI:  No.

 1              MR. HAYES:  No, your Honor.

 2              THE COURT:  All right.

 3         (Recess taken from 10:34 a.m. until 10:43 a.m.)

 4         (The voir dire panel enters the courtroom.)

 5              THE CLERK:  All rise.

 6         (Judge Leinenweber enters the courtroom.)

 7              THE COURT:  Good morning, Ladies and Gentlemen.

 8              You've been called here to participate in jury

 9    selection in a case entitled Darren Cuff, plaintiff, versus

10    Trans States Holdings, Inc., Trans States Airlines, GoJet

11    Airlines, and Ed Trowbridge, individually, defendants.

12              The plaintiff is in court in person and through his

13    counsel -- is it Mr. Caffarelli?  Would you introduce the

14    people at your table, please?

15              MR. CAFFARELLI:  Sure.

16              My name is Alex Caffarelli.  And with me is Bradley

17    Manewith, my associate.  Darren Cuff, plaintiff.  And Dave

18    Zehner also.

19              THE COURT:  The defendants are in court with Mr. David

20    Hayes, their counsel.

21              Would you introduce the people at your table, please?

22              MR. HAYES:  Yes, your Honor.

23              Good morning.  My name is David Hayes, and I represent

24    the corporate defendants and Mr. Eddie Trowbridge here at the

25    table.  Mr. Terry Basham is the corporate representative for

1    the three defendants.  Leslie Cavender and Allison Schultz are

2    both lawyers in my office.

3         Thank you.

4         THE COURT:  All right.  The other -- my name is Judge

5    Harry Leinenweber.  I'm the judge assigned this case.

6         The lady on my left, your right, is Miss Gayle

7    McGuigan.  She's the official court reporter, takes down

8    everything that's said.

9         And the lady on my right is Miss Wanda Parker, who is

10   the deputy clerk assigned to this courtroom.

11        Now, I'm going to give you a very brief statement of

12   what this case is about.  And it's my interpretation that the

13   case is about, and it's not binding on either party.

14        I kind of pieced this together, but I think it will

15   give you an idea of what the case is about and it will make --

16   when we have jury selection, it will make a little more sense

17   what my questions are.

18        This case involves the Federal Family and Medical

19   Leave Act.  And that's why the case is here in federal court

20   because it's a federal law that's involved in this case.

21        The plaintiff requested benefits of this Act, which

22   were denied by the defendant.

23        The defendant was -- denied because it contended that

24   the Act did not apply to it.

25        The Court, myself, has ruled that the Act does apply

1    to the defendant and that plaintiff was unlawfully denied

2    leave.

3             Plaintiff requests damages as a result of lost wages.

4             The defendant contends that plaintiff did not intend

5    to return from leave and subsequently-obtained information

6    shows that it would have discharged the plaintiff for cause.

7    Therefore, he is not entitled to damages or to the damages to

8    the extent claimed.

9             So that's the issues in the case, from my

10   interpretation.

11            And, again, I want to emphasize that it's not binding

12   on either side to contradict some of my interpretation of what

13   the case is about.

14            Now, one of the things that potential jurors are all

15   concerned about is how long are we going to be tied up.  And we

16   anticipate this case should take no more than three days.  And

17   I can -- at the outside, it will be finished this week.  So

18   that if you're selected as a juror in this case, you will be

19   required to be present each day that we sit, today, tomorrow,

20   Wednesday, and possibly on Thursday, but I wouldn't anticipate

21   going that far.

22            So the Court will sit approximately from 10:00 o'clock

23   in the morning until 5:00.  We take an hour off for lunch,

24   usually between 12:30 and 1:30.  And then we have a short

25   recess in both the morning and a short recess in the afternoon.

1      I pledge to you, to the extent that I can do so, I

2 will attempt to make sure that all of the time you're supposed

3 to be here in court that you will, in fact, be in here in court

4 listening to testimony and arguments, hearing the case, rather

5 than sitting, waiting for things to happen.

6      So I will pledge to you to do my absolute utmost to

7 make sure that this case, consistent with justice, proceeds as

8 rapidly as possible.

9      So would you all rise and be sworn?

10    (The voir dire panel was sworn.)

11      THE COURT:  Please be seated.

12      A couple questions about what's going to happen next.

13 For those of you who have not participated in jury selection,

14 some of you will be called -- we're going to pick a jury of

15 seven, seven of you.

16      And in order to determine your fitness for trial, and

17 I mean fitness to the extent sometimes people know something

18 about the case or they know one of the participants or they've

19 had a very bad experience which would prevent them, for

20 example, doing justice to one side or the other.  Such a person

21 can be excused for cause.

22      In addition, under federal law, each side is entitled

23 to request that a certain number of jurors be stricken or not

24 included in the jury without having to justify to me why they

25 don't want them.  That's what's called a peremptory challenge.

 1          In order for them to exercise their rights under

 2    federal law, they have to know a little bit something about

 3    you.

 4          Consequently, it's incumbent upon me to ask a few

 5    questions of you, which is I guess sort of an invasion of your

 6    privacy.  But having said that, I don't want to scare you

 7    because basically we're going to ask you a little bit of your

 8    background, your education, where you work, and that sort of

 9    thing, and your experience, for example, as to if you've ever

10    applied for Family Leave and things of that nature.  So it's

11    not going to be very invasive, so I didn't want to scare you in

12    advance.  We're not going to conduct an in-depth

13    cross-examination of each and every one of you, so I don't want

14    you to worry about it.  But I will have to ask you a few

15    questions, and I hope you'll put up with it.

16          Anything else, Wanda?

17          THE CLERK:  I think you've covered everything.

18          THE COURT:  Okay.  We're going to call seven of you.

19    And there's seven seats in the front row.

20          The first name called, please take the seat closest to

21    me.  The second name called, the next seat, three, four, five,

22    six, seven.

23          THE CLERK:  Martin Mueller.

24          Carolyn Steckbeck.

25          Patrick Quinnett.

1        Latonya Nelson.

2        So it should be Mueller, Steckbeck, Quinnett, and

3    Nelson.

4        Nichole Hoehn.

5        Brian Grant.

6        And Holly Cammack.

7        THE COURT:  Before I start asking questions, a couple

8    of ground rules:

9        One is that everything that's said is taken down by

10   the court reporter, so it's necessary for you to verbalize your

11   answer.  You can't go "ah-ha" or shrug your shoulders or nod or

12   things of that nature.

13       So I need an actual word from you and answer, whether

14   it's "yes" or "no" or whatever.  "Ah-ha" and "huh-uh" sound an

15   awful lot alike so -- they read an awful lot alike, so if

16   you're trying to figure out what was said -- so it's absolutely

17   necessary that you verbalize your answers.

18                          EXAMINATION

19            OF PROSPECTIVE JUROR MARTIN MUELLER:

20   BY THE COURT:

21   Q    So the first gentleman is -- it's Martin Mueller; is that

22   correct, sir?

23   A    Yes, it is.

24   Q    Where do you live?

25   A    Antioch, Illinois.

1    Q    How old are you?

2    A    57.

3    Q    What's your educational background?

4    A    High school and a little bit of college.

5    Q    All right.  What's your employment, sir?

6    A    I'm a printer at a bag manufacturing company.

7    Q    Are you married?

8    A    Yes.

9    Q    Is your spouse employed?

10   A    Yes.

11   Q    What does she do?

12   A    She's a housekeeper at a Kenosha hospital.

13   Q    Do you have children who are employed?

14   A    Yes, I have a daughter.  She's employed.  She's a nurse in

15   Tampa Hospital in Florida.

16   Q    Okay.  Have you or any of your immediate family ever

17   applied for leave under the Federal Leave Act or any other

18   leave provision, for example, in a union contract?

19   A    Never have.

20   Q    Have you ever -- any of that group, your immediate family,

21   ever been denied leave?

22   A    No.

23   Q    Okay.  Do you supervise other employees?

24   A    No.

25   Q    Okay.  Have you ever supervised employees?

1    A    No.

2    Q    Okay.  So you've never been in a position where you either

3    were in a position to grant or deny someone else leave?

4    A    No, I haven't.

5    Q    Okay.  Have you been on jury duty before?

6    A    I was in county jury duty about two years ago.

7    Q    Did you hear a case?

8    A    Would be in Lake -- no, I never got on a case.

9    Q    Okay.  Have you ever been involved in a lawsuit?  I'll

10   explain what I mean by "involved."  There's numerous ways you

11   can be involved.

12          If you file a lawsuit, like Mr. Cuff, you're the

13   plaintiff.  If you're a defendant in a lawsuit, like

14   Mr. Trowbridge, you're being sued.

15          You can also be involved in a lawsuit by participating

16   as a witness, things of that -- have you ever been --

17   A    No.

18   Q    -- involved in a lawsuit?

19   A    Never have.

20   Q    All right.  Are you familiar with any of the parties in

21   this lawsuit?

22   A    No, I'm not.

23   Q    Will you follow the law as I state it, even if you don't

24   agree with it?

25   A    Yes.

1   Q   Any reason you couldn't be a fair and impartial juror?

2   A   I feel there's no reason I could not.

3   Q   Thank you.

4                          EXAMINATION

5              OF PROSPECTIVE JUROR CAROLYN STECKBECK:

6   BY THE COURT:

7   Q   The next lady is Carolyn Steckbeck?

8   A   Yes.

9   Q   Did I pronounce it right?

10  A   Yes.

11  Q   Where do you live?

12  A   Chicago.

13  Q   And how old are you?

14  A   24.

15  Q   What's your educational background?

16  A   Bachelor's degree.

17  Q   In what?

18  A   Communications.

19  Q   Speak up a little.

20  A   Communications.

21  Q   And what is your employment?

22  A   I work in advertising.

23  Q   Are you married?

24  A   No.

25  Q   Okay.  Have you ever applied for leave under the Federal

1    Family Medical Leave Act or any other provision, for example,

2    of a union contract?

3    A    No.

4    Q    And I take it -- how about any of your very close family,

5    do you know have they ever applied for leave?

6    A    No.

7    Q    So no one has ever been denied leave either then, correct?

8    A    Correct.

9    Q    Do you supervise other employees?

10   A    No.

11   Q    So you've never been in a position to either grant or deny

12   leave to someone else?

13   A    Correct.

14   Q    Have you been on jury duty before?

15   A    No.

16   Q    Have you ever been involved in a lawsuit in any of the ways

17   I mentioned to Mr. Mueller?

18   A    No.

19   Q    Are you familiar with any of the parties to this lawsuit?

20   A    No.

21   Q    Will you follow the law as I state it, even if you don't

22   agree with it?

23   A    Yes.

24   Q    Any reason you couldn't be fair?

25   A    No.

```
 1                          EXAMINATION

 2              OF PROSPECTIVE JUROR PATRICK QUINNETT:

 3     BY THE COURT:

 4     Q    The next gentleman is Patrick Quinnett?

 5     A    Yes.

 6     Q    Did I pronounce it right?

 7     A    Yes, you did.

 8     Q    Where do you live?

 9     A    Elk Grove Village.

10     Q    How old are you?

11     A    I'm 63.

12     Q    What's your educational background?

13     A    I have a Bachelor's degree in mathematics.

14     Q    And what's your occupation or business?

15     A    I am currently a security manager.  Building security

16     manager.

17     Q    What type of business or facility are you --

18     A    I'm Union Station building.  Secure -- management of

19     security.

20     Q    Are you married?

21     A    Yes.

22     Q    Is your spouse employed?

23     A    Yes, she is.

24     Q    What does she do?

25     A    She's an account rep. for Market Day.
```

1   Q    Do you have children who are employed?

2   A    Yes, I do.

3   Q    Would you tell what they do?

4   A    My son works for McMaster-Carr, stocking.  And my daughter

5   works with autistic children.

6   Q    Okay.  Have you or any of the group you've just talked

7   about ever applied for leave under either the Federal Family

8   and Medical Leave Act or any provision such is provided in a

9   union agreement?

10  A    My family hasn't, no.

11  Q    And I take it, therefore, no one has ever been denied

12  leave?

13  A    Not in my family, no.

14  Q    Do you supervise other employees?

15  A    I don't now, but I did for 30 years.

16  Q    All right.  Now, did you -- were you ever in a position

17  where you were in a position to influence the granting or

18  denying leave under Federal Leave Act or any other provision?

19  A    Yes.

20  Q    And what -- tell us a little bit.

21  A    Different -- different people over the -- over the years.

22  I was at two banks in a small corporation.  Different people at

23  different times had applied for it.  So you sit down with the

24  Human Resources and go through what's going to happen, how it's

25  going to happen.

1    Q    Okay.  Occasionally were people denied?

2    A    I would say rarely.  Maybe one out of maybe the ten.

3    Q    Okay.  Did any litigation or anything result from that?

4    A    No.  Not that I know of.

5    Q    Have you been on jury duty before?

6    A    Yes.

7    Q    When and where?

8    A    I've been -- I've been called many times, but I've been on

9    one case many, many, many years ago.

10   Q    Where was the case and what -- just tell us what kind.

11   A    It had to do with a break-in.  It was I think at 22nd.

12   Q    That would be a criminal proceeding?

13   A    Correct.

14   Q    Okay.  You actually decided the case?

15   A    Yes, we did.

16   Q    Have you ever personally been involved in a lawsuit of any

17   type?

18   A    No, I have not.

19   Q    Are you familiar with any of the parties or the lawyers

20   here?

21   A    I am not.

22   Q    Okay.  Will you follow the law as I state it, even if you

23   don't agree with it?

24   A    I will.

25   Q    Any reason you couldn't be a fair and impartial juror in

1    this case?

2    A    No.

3                              EXAMINATION

4              OF PROSPECTIVE JUROR LATONYA NICOLE NELSON:

5    BY THE COURT:

6    Q    The next lady is Latonya Nicole Nelson, correct?

7    A    Morning.  Yes.

8    Q    Where do you live?

9    A    Chicago, Illinois.

10   Q    Okay.  How old are you?

11   A    I'm 41.

12   Q    What's your educational background?

13   A    High school and some college.

14   Q    Okay.  And what's your employment?

15   A    Right now I am unemployed, but in the process of getting

16   back into sales.  I'm a licensed realtor and insurance agent.

17   Q    Okay.  So you have in the past been -- sold real estate and

18   insurance?

19   A    Yes.

20   Q    Okay.  And you hope to get back into that, is that --

21   A    Yes.

22   Q    Are you married?

23   A    Yes, I am.

24   Q    Is your spouse employed?

25   A    He's self-employed.

1    Q    What does he do?

2    A    He's an HVAC technician.

3    Q    Okay.  Do you have children who are employed?

4    A    No, my children are in school.

5    Q    Okay.  Have you or any of your immediate family ever

6    applied for leave under either the Federal Family and Medical

7    Leave Act or any other provision such as leave provided under a

8    union agreement?

9    A    We've never applied; however, I had a sickly daughter when

10   I was working some years ago, so I have gone through the

11   application process to, I guess, qualify for it in the event it

12   did happen.

13   Q    Okay.  But you never actually completed the application?

14   A    No.  I've never --

15   Q    So you weren't denied leave.

16   A    No.

17   Q    You just never followed through.

18   A    (Indicating.)

19   Q    It turned out you didn't need it, is that --

20   A    Correct.

21   Q    Okay.  Is there anything about that experience that you

22   think would influence you in any way in this case?

23   A    No.

24   Q    Okay.  Do you -- have you or do you currently supervise any

25   employees?

1    A    No.

2    Q    Have you ever supervised employees?

3    A    No.

4    Q    So you've never personally participated in the decision

5    whether someone else should get leave or not; is that fair?

6    A    That's fair.

7    Q    Have you been on jury duty before?

8    A    First time.

9    Q    Okay.  Have you ever been involved in a lawsuit yourself?

10   A    No.

11   Q    Are you familiar with any of the parties or the lawyers?

12   A    No.

13   Q    Will you follow the law as I state it, even if you don't

14   agree with it?

15   A    Yes.

16   Q    Any reason you couldn't be fair?

17   A    No.

18                            EXAMINATION

19            OF PROSPECTIVE JUROR NICHOLE ANNE HOENE:

20   BY THE COURT:

21   Q    The next lady is Nichole Anne --

22   A    Hoehn.

23   Q    Hoehn?

24   A    Yes.

25   Q    Miss Hoehn, where do you live?

1    A    Chicago.

2    Q    And what's your age?

3    A    36.

4    Q    What's your educational background?

5    A    I have a Bachelor's degree in communications.

6    Q    And what's your business or occupation?

7    A    Stay-at-home mom.

8    Q    When you worked -- I take it you worked at some point?

9    A    Yes.

10   Q    What did you do when you worked?

11   A    I was in advertising.

12   Q    All right.  What did you do in advertising?  What was --

13   A    I was called an account person.  Like a client service.

14   Q    You're married.  What does your husband do?

15   A    He's self-employed.  He's in E commerce.  He has an on-line

16   retail store.

17   Q    Okay.  Do you have children who are employed?  Are they too

18   young?

19   A    She's too young.

20   Q    Have you ever applied for leave under either the Federal

21   Family and Medical Leave Act or any other provision provided

22   for leave?

23   A    Maternity leave.

24   Q    Pardon?

25   A    Maternity leave.

1   Q   Yeah.

2   A   Yes.

3   Q   Did you ever -- have you ever been denied leave?

4   A   No.

5   Q   Okay.  So you applied for leave and you got it and that

6   was -- then you went back to work after the --

7   A   Yeah.

8   Q   Okay.  Do you have -- have you or -- ever supervised other

9   employees?

10  A   Yes.

11  Q   Have you ever been in a position where you could influence

12  either the granting or denying leave --

13  A   No.

14  Q   -- to anybody?

15          So that was not part of your --

16  A   No.

17  Q   Okay.  Have you been on jury duty before?

18  A   Yes.

19  Q   When and where?

20  A   I -- it was in the early 2000s.  And I believe it was at

21  the Daley Center down the street.

22  Q   What kind of case did you hear?

23  A   It was a personal injury case.

24  Q   Somebody was asking for money --

25  A   Yes.

1    Q    -- as a result of an injury sustained, was it an accident?

2    A    Right.

3    Q    You actually decided the case?

4    A    Yeah.

5    Q    Okay.  That's the only time you've been a juror?

6    A    Yes.

7    Q    Have you ever been involved in a lawsuit yourself?

8    A    No.

9    Q    Are you familiar with any of the parties or the lawyers?

10   A    No.

11   Q    Will you follow the law as I state it, even if you don't

12   agree with it?

13   A    Yes.

14   Q    Any reason you couldn't be fair?

15   A    No.

16                          EXAMINATION

17                 OF PROSPECTIVE JUROR BRIAN GRANT:

18   BY THE COURT:

19   Q    Next person is Brian Grant?

20   A    Correct.

21   Q    Where do you live, sir?

22   A    Millbrook, Illinois.

23   Q    And how old are you?

24   A    47.

25   Q    What's your educational background?

1    A    Associate's Degree in electrical engineering.

2    Q    And what's your business or occupation?

3    A    Computer engineer.

4    Q    Are you married?

5    A    Yes.

6    Q    What does your spouse do?

7    A    She's a homemaker.

8    Q    Has she worked out of the home on occasion?

9    A    Not for a long time.

10   Q    Okay.  Do you have children who work?

11   A    I do.

12   Q    What do they do?

13   A    Cashier.

14   Q    Okay.  Have you or any of your family, including your wife,

15   ever applied for leave under the Federal Family and Medical

16   Leave Act or any other provision providing for leave?

17   A    No.

18   Q    I take it no one has ever been denied leave then?

19   A    Correct.

20   Q    Okay.  Do you supervise other employees?

21   A    I used to, but not today, no.

22   Q    Have you ever been involved in the decision to grant or

23   deny leave?

24   A    No.

25   Q    That was a no?

```
 1    A    That was a no.  Correct.

 2    Q    Okay.  Have you been on jury duty before?

 3    A    No.

 4    Q    Have you ever been involved in a lawsuit yourself?

 5    A    No.

 6    Q    Are you familiar with any of the parties or the lawyers?

 7    A    Nope.

 8    Q    Will you follow the law as I state it, even if you don't

 9    agree with it?

10    A    Yes.

11    Q    Any reason you couldn't be fair?

12    A    No.

13    Q    All right.

14                           EXAMINATION

15               OF PROSPECTIVE JUROR HOLLY CAMMACK:

16    BY THE COURT:

17    Q    Holly Cammack?

18    A    Yes.

19    Q    Did I pronounce it right?

20    A    Yes.

21    Q    Where do you live, Miss Cammack?

22    A    Tinley Park.

23    Q    And how old are you?

24    A    42.

25    Q    What's your educational background?
```

1    A    I have a Bachelor's in marketing.

2    Q    Just a little louder, please.

3    A    A Bachelor's in marketing.

4    Q    All right.  And what's your employment?

5    A    Employed by Santifee (phonetic) as a sale rep.

6    Q    You can take that microphone up.  Maybe that -- I think

7    it -- yeah.  And that -- it hooks up to her ear phone so ...

8    she can hear and I can read what she --

9    A    At Santifee (phonetic) as a sales rep.

10    Q    All right.  And are you married?

11    A    Not that I know of, no.  No.

12    Q    Have you ever been married?

13    A    Yes.

14    Q    And when you were, what did your husband do?  Or what does

15    he do?

16    A    A contractor.

17    Q    Like building contractor?

18    A    Yes.

19    Q    Do you have any children that are employed?

20    A    No.

21    Q    Have you or any of your close family ever applied for leave

22    under either the Federal Family and Medical Leave Act or any

23    other provision providing for leave?

24    A    I have applied for short-term disability.

25    Q    And were you granted it?

```
 1   A   Yes.
 2   Q   Did you have any trouble with it at all?  Getting it or --
 3   A   No.
 4   Q   Have you ever been denied leave?
 5   A   No.
 6   Q   Do you supervise other people?
 7   A   Not currently.
 8   Q   Have you?
 9   A   Yes.
10   Q   Have you ever participated in -- either in the decision
11   whether to grant someone else leave --
12   A   No.
13   Q   -- or deny someone else leave?
14   A   No.
15   Q   Have you been on jury duty before?
16   A   I have not.
17   Q   Have you ever been involved in a lawsuit yourself?
18   A   I did receive a settlement from a class action lawsuit that
19   I did not pursue.
20   Q   Okay.  What was the -- can you describe what the class was?
21   A   I don't even know if I can.  I just got a notice in the
22   mail that said if you want to opt out, fill out this paperwork.
23   If not, you will be receiving a check because the case has
24   already been settled.
25   Q   You got a check?
```

1    A    I did.

2    Q    Do you remember what it was for?  Was it --

3    A    It was the company with -- I currently work with.  And I

4    believe it had something to do with salary versus exempt

5    employees and causing them to work more than they were supposed

6    to.

7    Q    Okay.  Is there anything about that experience that you

8    were dissatisfied with?

9    A    I got money for nothing, so no.

10   Q    That's -- nothing wrong with that.  It's better than the

11   alternative.

12   A    Yeah.

13   Q    You got paid money for no reason.

14   A    Absolutely.

15   Q    That's your only lawsuit?

16   A    As far as -- yeah, as far as I know.

17   Q    You never met with a lawyer or anything like that?

18   A    Worker's comp. claim.

19   Q    You had a worker's comp. claim?

20   A    I did.

21   Q    And you had a lawyer for that?

22   A    It wasn't -- it was settled at -- by arbitration.  I didn't

23   have an attorney.

24   Q    Okay.  What type of -- I mean, briefly what kind of injury

25   did you have?

```
 1    A    It was a multiple -- multiple state involved vehicle
 2    accident.  And I was out of work for 100 days.
 3    Q    How long ago was that?
 4    A    I want to say '96.
 5    Q    Okay.  Are you okay now?
 6    A    I hope so.
 7    Q    Are you familiar with any of the parties or the lawyers?
 8    A    I don't believe I am.
 9    Q    Will you follow the law as I state it, even if you don't
10    agree with it?
11    A    Yes.
12    Q    Any reason you couldn't be fair?
13    A    No.
14    Q    Thank you.
15              THE COURT:  Lawyers?  Give me your ...
16         (Tendered.)
17              THE COURT:  Miss Nelson.  Miss Hoehn -- excuse me.
18              Miss Nelson.  Mr. Grant.  And Mr. -- or Miss Cammack
19    will be excused.
20              The other four can rise and be sworn, please.
21              THE CLERK:  You can go home and call the jury
22    department tomorrow after 5:00 o'clock.  And that goes for
23    anyone who is excused.  If you are excused, just go home and
24    call the jury department tomorrow after 5:00.  Tomorrow.
25              We have Mueller, Steckbeck, Quinnett, and Hoehn.
```

```
1              THE COURT:  Would you four please rise and be sworn?

2              THE CLERK:  Would you raise your right hand?

3         (Jurors Mueller, Steckbeck, Quinnett and Hoehn sworn.)

4              THE COURT:  Leave three seats, the first three seats,

5    if you would, please.

6              Call three more, please.

7              THE CLERK:  John Aver, Junior.

8              Vivian Lonak.

9              And Jason Tranchitella.

10                          EXAMINATION

11             OF PROSPECTIVE JUROR JOHN AVER, JR.:

12   BY THE COURT:

13   Q    First person, is it -- John, is it Aver?

14   A    John Aver, Junior, your Honor.

15   Q    And where do you live, sir?

16   A    Darien, Illinois.

17   Q    And how old are you?

18   A    48 years old.

19   Q    What's your educational background?

20   A    High school and a little bit of college.

21   Q    What is your business or occupation?

22   A    I'm a stationary engineer at the University of Illinois at

23   Chicago.

24   Q    Are you married?

25   A    Yes, I am.
```

1   Q    What does your spouse do?

2   A    My spouse, she works for like a workman's comp. company,

3   like she hears -- I don't know what exactly she does, but she

4   works for, like, an insurance company with workman's comp.

5   cases.

6   Q    So she works in evaluating or --

7   A    Yes.

8   Q    -- something along those lines?

9   A    Yeah.  She don't make any kind of decisions, though, on it.

10  Q    Do you have children who are employed?

11  A    No.

12  Q    Have you or your spouse or any really close family member

13  to your knowledge ever applied for leave under either the

14  Federal Family and Medical Leave Act or any other provision

15  provided for leave?

16  A    No.

17  Q    Okay.  I take it no one has ever been denied leave, to your

18  knowledge?

19  A    No.

20  Q    Do you supervise any other employees?

21  A    No, I don't.

22  Q    Have you ever supervised other employees?

23  A    No, I don't, your Honor.

24  Q    So you've never participated in a decision either to grant

25  or deny someone else leave?

```
 1    A    No.
 2    Q    Okay.  Have you been on jury duty before?
 3    A    I have but never on a -- called to a case, your Honor.
 4    Q    All right.  And have you ever been involved personally in a
 5    lawsuit?
 6    A    No, I haven't.
 7    Q    All right.  Are you familiar with any of the parties or the
 8    lawyers out here?
 9    A    You aren't related to Paul Caffarelli, are you?
10         MR. CAFFARELLI:  No.
11         THE WITNESS:  Okay.
12    BY THE COURT:
13    Q    All right.  The answer is no then?
14    A    No.
15    Q    All right.  Will you follow the law as I state it, even if
16    you don't agree with it?
17    A    Yes, I will.
18    Q    Any reason you couldn't be a fair and impartial juror?
19    A    No.
20    Q    Okay.
21                              EXAMINATION
22                   OF PROSPECTIVE JUROR VIVIAN LONAK:
23    BY THE COURT:
24    Q    Next person is Vivian, is it Lonak?
25    A    Lonak.
```

1    Q    Lonak, is that how you pronounce it?

2         Where do you live?

3    A    Justice, Illinois.

4    Q    How old are you?

5    A    55.

6    Q    What's your educational background?

7    A    High school.

8    Q    And what's your business or occupation?

9    A    I'm a train attendant for Amtrak.

10   Q    Okay.  Are you married?

11   A    Yes.

12   Q    What does your spouse do?

13   A    He's a production -- production supervisor for Azteca

14   Foods.

15   Q    What is that business?

16   A    Food industry.

17   Q    Do you have children who are employed?

18   A    Yes, I do.

19   Q    What do they do?

20   A    My oldest is a locomotive attendant for Union Pacific.

21        My middle son is a staff sergeant in the United States

22   Air Force.

23        And my youngest son is a gaming attendant.

24   Q    Okay.  Have you or any of your close family, including the

25   people you just mentioned, to your knowledge ever applied for

1    leave under either the Federal Family and Medical Leave Act or

2    any other provision provided for leave like a union contract?

3    A    Yes, I have.

4    Q    And for what specific purpose?

5    A    Medical reasons.

6    Q    All right.  Have you ever been denied leave?

7    A    No.

8    Q    How many times?  Just once?

9    A    Just one time.

10   Q    Okay.  And was that under -- was that under the federal law

11   or under a contract or union contract or do you know what was

12   the basis --

13   A    It was under the federal law.

14   Q    Pardon?

15   A    It was under the federal.

16   Q    Okay.  So you just filed an application --

17   A    Correct.

18   Q    -- and they granted it --

19   A    Yes.

20   Q    -- and that was it?

21        All right.  So have you ever been denied leave?

22   A    No.

23   Q    Do you supervise other employees --

24   A    No.

25   Q    -- or have you ever supervised --

1    A    I have, yes.

2    Q    Have you ever been involved in a decision as a supervisor

3    to either grant or deny leave to someone else?

4    A    No.

5    Q    Have you been on jury duty before?

6    A    No.

7    Q    Have you ever been involved in a lawsuit yourself?

8    A    Yes.

9    Q    Tell us when and what circumstances.

10   A    Car accident, personal injury.

11   Q    And --

12   A    That was --

13   Q    You were injured?

14   A    Yes.

15   Q    And was that the reason for the leave?

16   A    No.

17   Q    Different situation?

18   A    Yeah.  The car accident was 35 years ago.

19   Q    Okay.  Was there a lawsuit?  Actually go to trial or did it

20   get resolved?

21   A    It got resolved.

22   Q    Are you familiar with any of the parties or the lawyers?

23   A    No.

24   Q    Okay.  Will you follow the law as I state it, even if you

25   don't agree with it?

```
1    A    Yes.

2    Q    Any reason you couldn't be fair?

3    A    No.

4    Q    All right.

5                          EXAMINATION

6              OF PROSPECTIVE JUROR JASON TRANCHITELLA:

7    BY THE COURT:

8    Q    All right.  The next gentleman is Jason Tranchitella?

9    A    Yes, sir.

10   Q    Is that close --

11   A    You said it fine.  Yeah.

12   Q    Where do you live, sir?

13   A    West Chicago, Illinois.

14   Q    How old are you?

15   A    32.

16   Q    What's your educational background?

17   A    Some college.

18   Q    And what's your business or occupation?

19   A    I work for a family-owned construction company.  General

20   contractor.

21   Q    Are you married?

22   A    No.

23   Q    Have you ever been married?

24   A    No.

25   Q    Have you or any of your close family, to your knowledge,
```

1    ever applied for leave under either the Federal Family and

2    Medical Leave Act or any other provision provided for leave?

3    A    No.

4    Q    I take it no one has ever been denied leave that you're

5    aware of?

6    A    No.

7    Q    Do you or have you supervised other employees?

8    A    Yes, I have.

9    Q    All right.  And as part of your supervision, have you ever

10   been involved in a decision either to grant leave to someone

11   under the Family Leave Act or any other leave provision or deny

12   it?

13   A    No, I haven't.  That's the HR department's job.

14   Q    It came up -- if someone did apply for leave, would it come

15   to you?

16   A    No, we just forward it to HR.

17   Q    All right.  Have you been on jury duty before?

18   A    No, I have not.

19   Q    Have you ever been involved in a lawsuit personally?

20   A    I was a defendant, but my insurance company took care of

21   it.

22   Q    Was that a result of an accident?

23   A    That was a workplace incident, yes, sir.

24   Q    Okay.  So never went really to trial or anything like that?

25   A    My insurance took care of it.

1    Q    All right.  Will you follow the law as I -- excuse me, are

2    you familiar with any of the lawyers or the parties?

3    A    No, I'm not.

4    Q    Will you follow the law as I state it, even if you don't

5    agree with it?

6    A    Yes, sir.

7    Q    Any reason you couldn't be fair and impartial?

8    A    Nope.

9    Q    Okay.

10        (Tendered.)

11            THE COURT:  All right.  Mr. -- Miss Lonak and

12   Mr. Tranchitella will be excused.

13            Swear in Mr. Aver.

14            THE CLERK:  Stand and raise your right hand.

15        (Juror Aver sworn.)

16            THE COURT:  Would you move down and join the others?

17   Leave two seats.  And then call two more, please.

18            THE CLERK:  Is there something on the floor there?

19            JUROR:  No.

20            THE CLERK:  Okay.

21            THE COURT:  Two more.

22            THE CLERK:  Dorothy Dziura, that's D-Z-I-U-R-A.  And

23   Ines Nevarez.

24                         EXAMINATION

25              OF PROSPECTIVE JUROR DOROTHY DZIURA:

```
 1    BY THE COURT:

 2    Q    Do you pronounce it Dziura?  Dziura?

 3    A    Sure.

 4    Q    How do you --

 5    A    Dziura.

 6    Q    Dziura.  Silent D?

 7    A    Yes.

 8    Q    Okay.  You are Dorothy Dziura then; is that correct?

 9    A    Yes.

10    Q    Where do you live?

11    A    Mt. Prospect, Illinois.

12    Q    How old are you?

13    A    26.

14    Q    What's your educational background?

15    A    Bachelor's in marine biology.

16    Q    And what is your business or occupation?

17    A    I work for Buffalo Wild Wings as a bartender.

18    Q    Okay.  Are you married?

19    A    No.

20    Q    Have you ever been married?

21    A    No.

22    Q    Have you ever had occasion to apply for leave under the

23    Federal Family and Medical Leave Act or any other leave

24    provision?

25    A    No.
```

```
 1    Q    I take it you've never been denied leave?
 2    A    No.
 3    Q    Do you supervise anybody else at your business?
 4    A    No.
 5    Q    Have you ever supervised other people?
 6    A    No.
 7    Q    So you've never participated in any decision to grant or
 8    deny leave; is that right?
 9    A    No.
10    Q    Have you been on jury duty before?
11    A    No.
12    Q    Have you ever been involved in a lawsuit?
13    A    No.
14    Q    Are you familiar with any of the parties or the lawyers?
15    A    No.
16    Q    Will you follow the law as I state it, even if you don't
17    agree with it?
18    A    Yes.
19    Q    Any reason you couldn't be fair?
20    A    No.
21                          EXAMINATION
22              OF PROSPECTIVE JUROR INES NEVAREZ:
23    BY THE COURT:
24    Q    The next lady is Ines Nevarez?
25    A    Correct.
```

1   Q   Where do you live?

2   A   Highland, Illinois.

3   Q   How old are you?

4   A   36.

5   Q   What's your educational background?

6   A   High school with some college.

7   Q   And what is your business or occupation?

8   A   I am an administrative assistant for a steel company.

9   Q   Are you married?

10  A   Yes.

11  Q   What does your spouse do?

12  A   He is a business owner of automotive transmissions.

13  Q   Do you have children who are employed?

14  A   I have one child.  She's in school.

15  Q   Have you or anybody in your family that you're aware of

16  ever applied for leave under either the Federal Family and

17  Medical Leave Act or any other provision provided for leave?

18  A   Maternity leave.  Just maternity leave, if that counts.

19  Q   You did apply for and --

20  A   For myself.

21  Q   Okay.  You applied for it and you received it?  No problem

22  at all --

23  A   No problem.

24  Q   -- is that right?  Okay.

25          Have you ever been denied leave?

1    A    No.

2    Q    Do you supervise other employees?

3    A    I have.

4    Q    Have you, as a supervisor, either now or in the past, ever

5    been in a position where you participated in the decision,

6    either made the decision or participated in granting leave or

7    denying leave to someone else?

8    A    No.  Those are not my calls.

9    Q    Have you been on jury duty before?

10   A    Have.  But not for a case.  I've been in Lake County.

11   Q    Okay.  You actually never sat on a case?

12   A    Right.  I had to go four days, waited, never got called.

13   Q    All right.  Have you ever been involved in a lawsuit?

14   A    No.

15   Q    Are you familiar with any of the parties or the lawyers?

16   A    No.

17   Q    Will you follow the law as I state it?

18   A    Yes.

19   Q    Any reason you couldn't be fair?

20   A    No.

21   Q    Okay.

22        (Tendered.)

23           THE COURT:  Okay.  Would you swear in these two

24   ladies, please?

25        (Jurors Dziura and Nevarez sworn.)

1          THE COURT:  We've completed jury selection.  I thank

2   the people in the back for your patience.

3          What should they do?  Go back --

4          THE CLERK:  You're done for the day.  Call the jury

5   department tomorrow after 5:00.

6          THE COURT:  All right.  For the seven of you, we're

7   going to take a short recess, and then you'll come back in

8   about ten minutes.  We're going to have the opening statements.

9   It's the opportunity the lawyers have to tell you what this

10  case is about.  I gave you a brief description of what I

11  understood the case to be about, but the lawyers will flesh in

12  the actual issues in the case and what you should expect to

13  hear during the course of the trial.

14          They're designed to be helpful.  Oftentimes, testimony

15  doesn't come in in a perfectly logical or chronological order,

16  so it's helpful to have an overview is what the lawyers will

17  give you of what they think the case -- testimony will be.

18          The only word of caution is what the lawyers are --

19  they are not witnesses.  They don't provide evidence.  They can

20  only tell you what they think the evidence will be.

21          So if the lawyer tells you to expect the testimony to

22  be thus and so, and then during the course of the trial it's

23  your collective recollection that that wasn't the case, then

24  you ignore what the lawyers say and you go with the

25  recollections of what the actual testimony and witness and

1    exhibits will be.  But, again, they're designed to be helpful.

2         A couple things, just to -- everybody now has access

3    to a computer and they have Smart Phones and all this sort of

4    thing.

5         Please do not attempt to do any independent research,

6    like find out who the lawyers are or what this case is about,

7    see if there's anything on the internet.

8         It's very important that you limit your understanding

9    of the case solely to what you hear in the courtroom.

10        So don't go back, get out your Smart Phone, look up me

11   or any of the lawyers or the plaintiff or the defendants and

12   try to do any independent research.  That would be totally

13   improper, and I instruct you not to do that.

14        And please don't discuss the case among yourselves or

15   with anybody else until you've heard all the evidence and you

16   heard the instructions of the Court and retire to consider your

17   verdict.  Then you should all band together, all seven of you,

18   and decide how to decide the fact issues of the case.

19        Don't allow anybody else to give you advice.  If you

20   start telling people I'm involved in a case involving the

21   Family Leave Act, oh, I've got some advice for you on that, and

22   I tell you, you should -- that's a terrible act or it's the

23   best act that ever should be, and blah, blah, blah.  And

24   then -- because the lawyers won't know who told you that or

25   they haven't had a chance to cross-examine those people, it

1    would be unfair for you to take something like that into

2    consideration in deciding the case.

3           So we'll try to get this case, as I said, consistent

4    with justice, as rapidly as possible so you can return to your

5    regular duties.

6           But I'm going to ask you just to do those things.

7    Don't try to find out anything about the case or the subject or

8    anything else until after the case is over and after you've

9    decided the case.  Then you can do almost anything you want.

10          But we're going to take a 10-minute recess.  We'll

11   start promptly at 20 minutes to 12:00 with opening statements.

12          You'll hear from the plaintiff first, and then you'll

13   hear from the defense.

14          THE CLERK:  All rise.

15          Did you have anything to get from the back?

16          THE COURT:  By the way, the court -- the jury room

17   will be locked when you're in here, so you can leave your

18   belongings in the jury room while you're in here.

19          THE CLERK:  You can go out this door and make a left.

20    (Recess taken from 11:31 a.m. until 11:41 a.m.)

21    (In open court out of the presence of the jury.)

22          THE COURT:  Ready for the opening?

23          MR. CAFFARELLI:  Yes, your Honor.

24          MR. HAYES:  Yes, your Honor.

25          THE COURT:  Bring the jury in.

Opening Statement - Mr. Caffarelli

```
1            THE CLERK:  Ready?

2            THE COURT:  Yes.  All set.

3            THE CLERK:  Okay.

4            THE COURT:  After your opening, we'll break for an

5    hour, and then come back and then start calling the witnesses.

6            Mr. Caffarelli, are you giving the opening?

7            MR. CAFFARELLI:  Yes.

8            THE COURT:  Okay.

9            MR. CAFFARELLI:  No relation --

10           THE COURT:  Mr. Hayes, are you giving the opening?

11           MR. HAYES:  Yes, your Honor.

12           THE COURT:  Okay.

13       (Jury in at 11:43 a.m.)

14           THE COURT:  You can sit anywhere you want.  You don't

15   have to sit where you were selected.  Wherever is comfortable.

16           The plaintiff has the burden of proof in the case, so

17   the plaintiff goes first in virtually every aspect of the case,

18   including the opening statement.

19           So, Mr. Caffarelli, you may give the opening

20   statements for Mr. Cuff.

21           MR. CAFFARELLI:  Thank you, your Honor.

22   OPENING STATEMENT BY MR. CAFFARELLI:

23           MR. CAFFARELLI:  Good morning.

24           THE JURY:  Good morning.

25           MR. CAFFARELLI:  My name is Alex Caffarelli, and I
```

Opening Statement - Mr. Caffarelli

1    introduced myself earlier, but I'll introduce myself again.

2             With me is Brad Manewith and Darren Cuff.  Darren Cuff

3    is the plaintiff in this case.  And with us is Dave Zehner,

4    although Mr. Zehner has to leave shortly, so you won't be

5    seeing him.

6             This should be a relatively simple case.  This case is

7    simple because of what you don't have to do.

8             Unlike most of the cases here, you don't have to

9    decide whether or not Trans States broke the law.  That, as the

10   judge mentioned, has already been decided by the judge.

11            Trans States interfered with Darren Cuff's rights

12   under the Family and Medical Leave Act.

13            Now, they can't deny this simple fact.  Instead of

14   honoring his request for FMLA leave, Darren Cuff was fired.

15            Your job at the end of this trial will be to determine

16   the consequences that Trans States should face.  In a civil

17   lawsuit, those are called damages or what are referred to as

18   damages, because calculating damages is a job for the jury, not

19   the judge.

20            And the only damages that Mr. Cuff is asking you to

21   award are his lost wages and benefits from the time that he was

22   fired until today.  It's been about two years getting to trial.

23   And these damages, we will argue, were caused by defendants'

24   conduct.

25            As you know, this case was brought under the Family

Opening Statement - Mr. Caffarelli

1   Medical Leave Act, the FMLA.

2           This law was passed in the 1990s to protect workers

3   from losing their jobs if they needed time off to treat or

4   recover from a medical condition, in order to care for a sick

5   family member, or in order to have birth or care for your

6   child.

7           Some of you I understand are familiar with the FMLA

8   from your own work.  It normally provides up to 12 weeks of

9   leave in a year's period.  And workers who take the FMLA are

10  normally guaranteed their jobs when they return from leave.

11          Another benefit of the FMLA is that it doesn't need to

12  be taken all at once, particularly when you're talking about

13  medical conditions.  It can be taken intermittently.  So a day

14  at a time, a week at a time, whatever is necessary to bring

15  your condition under control.

16          And the whole purpose of the FMLA was so that

17  employees wouldn't have to choose between their health and

18  their job or in the case of a birth between having a baby and

19  their job.

20          Darren Cuff qualified for the FMLA because of his own

21  health conditions.  That's one of the subcategories under the

22  FMLA.

23          He suffered from -- he has suffered from Crohn's

24  disease since he was 13 years old.  Crohn's disease, just

25  briefly, is a condition that eats away at your digestive

Opening Statement - Mr. Caffarelli

1    system.  It's a chronic condition.  There's no cure.  So it's

2    really about managing the symptoms and living with it.  Every

3    now and then, the condition will flare up, particularly when

4    Mr. Cuff is under stress.

5            In 2008, he was also diagnosed with bipolar disease.

6    It's a psychiatric condition that causes mood swings from what

7    are called manic phases to severe depression.  And it's not

8    happening every day all the time obviously.  It's the type of

9    thing that will flare up under stress.

10           Even though Mr. Cuff has had Crohn's for almost his

11   entire life and bipolar more recently was diagnosed, he's been

12   able to work.

13           Less than a year out of high school, Mr. Cuff got his

14   first job in the airline industry.  And for seven years he

15   worked at Comair Airlines, which is a subsidiary of Delta.

16           In 2006, he applied for and was hired to be a regional

17   manager for Trans States.  And Trans States is the defendant in

18   this case -- one of the defendants in this case.

19           And Trans States operates regional flights for some of

20   the major airlines.  So when you hear United Express or

21   American Eagle, Delta Connection, those are typically run by

22   regional airlines such as Trans States.

23           And in this case, Trans States Holding, the holding

24   company, owns three airlines:  Trans States Airlines, GoJet

25   Airlines, and Comair -- or Compass Airlines, excuse me.

Opening Statement - Mr. Caffarelli

1        When he was hired in 2006, Mr. Cuff interviewed with

2    Terry Basham.  Mr. Basham is here today.

3        Terry Basham was and is the vice-president of customer

4    service for Trans States.

5        And during this interview, he had a long discussion

6    with Mr. Basham where he fully disclosed his medical

7    conditions, including his medical limitations.

8        Despite these limitations, knowing about these

9    limitations, Trans States hired Darren Cuff.

10       And Mr. Cuff will tell you that Mr. Basham was very

11   understanding and promised to work with Mr. Cuff to help him

12   manage his conditions and get the job done.

13       Mr. Basham told him that because of the nature of the

14   work, Mr. Cuff would be able to work flexible hours and

15   sometimes work from home.

16       As a regional manager, Darren Cuff was responsible for

17   20 airports across the United States.

18       His job was to oversee operations at each one of those

19   airports and also to act as a liaison between Trans States and

20   government agencies, such as the FAA and the Department of

21   Homeland Security.

22       Now, obviously Mr. Cuff couldn't be in all 20 airports

23   at once, which is why a large portion of his job -- and you'll

24   hear his testimony -- was done over the phone or by e-mail with

25   each of the particular stations.  And this is why Mr. Basham

Opening Statement - Mr. Caffarelli

1   gave him the flexibility that he needed just to get the job

2   done.

3          For two years, Mr. Cuff was an excellent employee for

4   Trans States.  He received raises both years and no complaints.

5          When Terry Basham gave his testimony in a sworn

6   deposition before this lawsuit, he admitted that Mr. Cuff was a

7   great employee.

8          Darren Cuff gave Trans States, we believe the evidence

9   will show, 100 percent.  He was on nights and weekends.  He was

10  on e-mail.  He was on the phone.  He did just whatever it took

11  to get the job done.

12         You'll also hear from Lacy Weber, one of Mr. Cuff's

13  co-workers.  And she'll tell you that he was an excellent

14  employee and respected by everyone who he worked with.

15         Although Darren Cuff was an excellent employee,

16  sometimes his condition would flare up, and he would need to

17  take some time off to recover when he experienced those

18  flare-ups.

19         And this is where the FMLA comes in.

20         Even though Mr. Cuff was entitled to 12 weeks of FMLA

21  leave per year, he never took nearly that amount of time.

22         The evidence will show that he just took whatever was

23  necessary to bring his condition under control and get back to

24  work.

25         And even when he was still -- when he was sick or he

Opening Statement - Mr. Caffarelli

1   was out on FMLA, the evidence will show that Darren Cuff kept

2   working.  He was the type of employee who, even though he had

3   the right under the law to take a week or two off to recover,

4   he was still on e-mail, making phone calls, just making sure

5   that everything was covered.

6          Now, in December -- in October of 2008, about two

7   years after Mr. Cuff is hired, Ed Trowbridge became the

8   managing director for customer and ground service.  And

9   Mr. Trowbridge is here today as well.

10         This was a new position between Mr. Cuff and

11  Mr. Basham.  That meant that Mr. Cuff now reported directly to

12  Ed Trowbridge instead of reporting directly to Mr. Basham.

13         Now, unfortunately for Mr. Cuff, when Ed Trowbridge

14  replaced Terry Basham as his direct supervisor, everything

15  changed.

16         Mr. Trowbridge didn't want to continue the methods

17  that Mr. Basham and Mr. Cuff had developed in order to help

18  Mr. Cuff do his job and manage his conditions at the same time.

19         These were the methods that allowed Mr. Cuff to

20  effectively manage the condition and be a good employee.

21         The evidence will show that Mr. Trowbridge was not

22  happy about Mr. Cuff's medical issues.  He wasn't happy about

23  the FMLA leaves.  And he wasn't happy about Mr. Cuff working

24  remotely.  He wanted Darren Cuff to be on site all the time at

25  O'Hare Airport.

Opening Statement - Mr. Caffarelli

1    Mr. Trowbridge's insistence that Darren Cuff be on
2  site all the time exacerbated Mr. Cuff's condition.
3    Instead of being able to manage his flare-ups
4  effectively, Mr. Cuff had to push through and physically keep
5  going to work, even when he felt that he medically couldn't do
6  it.
7    And so as a result, he had more serious flare-ups, and
8  this started a vicious cycle of having a flare-up, pushing
9  through going to work, exacerbating the condition.
10    So in September of 2009, he was hospitalized for a few
11  days after a serious flare-up.
12    When Mr. Cuff returned to work following his
13  hospitalization in September of '09, he -- Mr. Trowbridge met
14  with him and disciplined him for attendance.  And Mr. Cuff was
15  told that if his attendance did not improve, he could lose his
16  job.
17    On December 9th, 2009, so a few months later,
18  Mr. Cuff's doctor, Dr. Eric Christoff, who is affiliated with
19  Northwest Memorial Hospital, completed and signed a
20  certification form requesting that Darren Cuff be granted four
21  weeks of FMLA leave.
22    This was so that Mr. Cuff could finally try to bring
23  his conditions under control.
24    And you'll see a copy of that certification form.
25    At this point, Mr. Cuff had used less than half of his

Opening Statement - Mr. Caffarelli

1   available FMLA time, so he should have had more than enough

2   FMLA days left to get better, to recover, as Dr. Christoff had

3   ordered.

4           But the evidence will show that for Mr. Trowbridge,

5   that was the last straw.

6           So instead of granting the FMLA leave, Mr. Trowbridge

7   wrote an e-mail to Trans States' in-house lawyer in St. Louis,

8   Mr. David Hayes, quote, requesting guidance.  And you'll see a

9   copy of that e-mail as well.

10          With the help of Mr. Hayes, Ed Trowbridge came up with

11  a plan.  The plan was to claim that Mr. Cuff only worked for

12  Trans States Airlines subsidiary, not Trans States Holdings,

13  not GoJet, not any of the other companies.

14          MR. HAYES:  Your Honor, objection.

15          MR. CAFFARELLI:  It goes to good faith, your Honor.

16          THE COURT:  Well, he's indicating what he thinks the

17  testimony will be.  We'll see.

18          MR. CAFFARELLI:  And that Trans States didn't have

19  enough employees in Chicago for Mr. Cuff to qualify for the

20  FMLA.

21          So a letter was drafted for Mr. Trowbridge to send

22  back to Mr. Cuff saying that as an employee of Trans States

23  Airlines, Mr. Cuff didn't qualify for FMLA leave and denying

24  the four weeks that his doctor had requested.

25          And you'll see a copy of that letter as well.

Opening Statement - Mr. Caffarelli

1          This came as a shock to Darren Cuff, first of all,

2    because they had never before questioned his right to FMLA

3    leave; and, second, because the evidence is overwhelming that

4    Darren Cuff did not just work for Trans States Airlines.  They

5    gave him a business card that said Trans States Holdings,

6    Trans States Airlines and GoJet on it.  Held him out as a

7    Trans States Holdings' employee to the Federal Aviation

8    Administration and the Department of Homeland Security.  He was

9    held out as a contact for all three companies.  He had access

10   to all three internal websites.  He managed both the

11   Trans States Airlines and the GoJet operations around the

12   country.

13         There's more.  And as the Court has instructed you at

14   the beginning of the day, the Court has already looked at all

15   of this information and determined that that was wrong, that

16   for purposes of the FMLA, Mr. Cuff wasn't an employee -- was

17   not just an employee of Trans States Airlines, but that he, in

18   fact, was an employee of all of those entities.  And that by

19   claiming he was solely an employee of Trans States Airlines,

20   the law was violated.  The FMLA was violated.

21         Now, Mr. Cuff didn't know that at the time, so Ed

22   Trowbridge's refusal to grant this FMLA leave greatly increased

23   his stress levels.  And not wanting to lose his job, he didn't

24   just take it off.  He kept coming in to work.

25         But after a few weeks, he realized his health was

Opening Statement - Mr. Caffarelli

1   getting worse.  If he didn't take the four weeks of leave that
2   his doctor ordered, he felt that he would be putting himself in
3   serious jeopardy.
4           So on December 30th, 2009, he told Ed Trowbridge that
5   he was going to take the four weeks off that his doctor had
6   recommended, the four weeks he felt he needed to get better.
7           Now, hedging their bets, again, after speaking with
8   their lawyer, and without consulting a doctor or medical
9   expert, Trans States arbitrarily decided that one week should
10  be enough.  It's ten days, but it captures the two weekends.
11  And they told Mr. Cuff that he would be fired if he didn't
12  report back to work on January 11th of 2010.
13          So instead of following the medical advice of
14  Dr. Christoff, Trans States followed the medical advice of
15  their lawyer.
16          Mr. Cuff was not medically ready to go back on
17  January 11th.  And when he didn't, he was fired.
18          Despite his best efforts, two years later, he's
19  unemployed, uninsured, and living with his parents.  Economy
20  has not been good, and his options are limited.
21          Again, you don't need to determine whether or not
22  Trans States violated the FMLA.  The only thing you need to
23  determine at the end of this case are the amount of damages
24  that Trans States should pay as a result of their conduct.
25          And as I said at the beginning of this case, this

Opening Statement - Mr. Caffarelli

1   should be a simple task, but defendants will likely try to make

2   it complicated.

3           The reason they do this is to argue that you should

4   limit the damages based upon a legal doctrine known as

5   after-acquired evidence.

6           And under this doctrine, if a company discovers

7   information after the fact that an employee would have

8   definitely been fired for some other reason, they can argue

9   that you, the jury, should cut off or limit his back pay.  Not

10  all of it, just as of the date that they discovered that

11  information, after the termination on January 11th but at some

12  point between then and now.

13          In other words, it's damage control.

14          Now, the judge will give you precise instructions at

15  the end of this trial.  And the key is to just listen to what

16  the judge says about those instructions and take in all of the

17  evidence that you've heard during the trial to reach your

18  decision.

19          But you'll hear them argue a number of things, that he

20  never intended to go back to work, that he misused some of his

21  previous sick days.

22          The evidence will show that none of these things,

23  whether or not they're even true -- and we contest that many of

24  these things are even true -- would have actually led to

25  Mr. Cuff's termination.

Opening Statement - Mr. Caffarelli

1    It's the same with the rest of their arguments.

2    Now, I can continue to go through each one of the

3    arguments I think that they're going to make and discuss them,

4    but I'll just let them say whatever they're going say.

5    I'll let you hear the testimony for yourselves and

6    leave the analysis for closing arguments.

7    After you've heard all the testimony and seen all the

8    documents, the judge will instruct you on the law, and we'll

9    ask you what you believe are the appropriate amount of damages

10   in this case.

11   And, again, this is an FMLA case, so this is not a

12   personal injury case where punitive damages or emotional

13   distress or any of that comes into play.

14   It's just fact -- it's a matter of calculating the

15   back pay.

16   We appreciate the time you've taken to serve on this

17   jury.  We're going to try to keep it short.  I know it's not a

18   convenient thing to do.  But you do perform a vital role

19   because the FMLA would be meaningless, any law would be

20   meaningless unless a jury were there behind the law to enforce

21   it.

22   Thank you.

23   THE COURT:  Mr. Hayes, you may give the opening

24   statements for the defendants.

25   OPENING STATEMENT BY MR. HAYES:

Opening Statement - Mr. Hayes

1    MR. HAYES:  Thank you, your Honor.

2    It's still good morning, Ladies and Gentlemen.

3    Again, thank you for being here.  My name is David

4  Hayes.

5    We've introduced the folks at the table again, but

6  Allison is a lawyer in my office.  Leslie Cavender.  Mr. Basham

7  is here on behalf of the three companies.  And Mr. Trowbridge

8  himself is a defendant.

9    It shouldn't surprise you a lot that we have a lot of

10  disagreement about part of this, part of which we don't

11  disagree with.

12    The judge has told us that when the calculation was

13  made at the company that we did it wrong, but "wrong" doesn't

14  mean that Mr. Cuff is entitled to any money.  That's a question

15  for you to decide.

16    As you came to work or you come wherever you're going,

17  you're going 56 miles an hour, you're breaking the law on the

18  highway.  That doesn't mean you should get hundreds of

19  thousands of dollars.

20    You heard, and I thought it was very nice of opposing

21  counsel there, to walk you through the fact that Mr. Trowbridge

22  is going to testify that 100 percent of the time, if he's going

23  to turn somebody down for FMLA, he calls Legal and asks them

24  that question.

25    That's not sinister.  We're not embarrassed about

Opening Statement - Mr. Hayes

1    that.  We're going to tell you about that.  He's going to tell

2    you that before he turned Mr. Cuff down, he called Legal to say

3    what should I do?

4           Now, the judge, years later, has determined that we

5    were wrong.  But that doesn't mean, we believe, that Mr. Cuff

6    is entitled to damages.

7           In addition, we talked a little bit about our

8    operation.

9           I think what's very important to understand is at

10   O'Hare Airport where Mr. Cuff worked, he was the only manager.

11   That is, we have dozens of airplanes coming in, thousands of

12   passengers every day, riding on United Express.  The regional

13   jets, the middle-sized jets operating there, he's our only

14   person.  He's it.  When he's not there, there's no one there

15   managing the relationship with our passengers, looking out to

16   make sure that airplane and the bags and the people get where

17   they're supposed to go.  He's the man up there.

18          That's important because when we talk about the end

19   game of this, Mr. Trowbridge is going to testify that he's

20   working with Darren, that the company has made a decision, in

21   consultation with Mr. Trowbridge, that, in fact, we didn't

22   believe he was eligible for this FMLA.

23          Again, don't want to argue that.  The judge has

24   already decided that.

25          This -- but this is Christmastime.  If any of you have

Opening Statement - Mr. Hayes

1    ever been to O'Hare at Christmastime, there's no time we need

2    him there more than right then.

3           Mr. Trowbridge is going to tell you about Darren not

4    returning his calls, not even giving us an update on what was

5    going on with him at that point.

6           It's a very -- some of the issues I guess are very

7    simple.  We agree with that.

8           The lost wages calculation, up till today, again, we

9    don't think that's the appropriate number, if there's a number.

10   Because just because we were wrong at the time that decision

11   was made doesn't mean Mr. Cuff is entitled to any money.

12          Also opposing counsel briefly told you about

13   after-acquired evidence.

14          I think that's very relevant.

15          Mr. Trowbridge is going to tell you that he has a

16   different management style than Mr. Basham.

17          Mr. Basham is a vice-president.  Supervises hundreds

18   and hundreds of employees.  Didn't focus a laser on Darren.

19   Yeah, Darren, whatever is going on -- he's going to tell you

20   that he had a very loose management style.  So he didn't follow

21   up.

22          Mr. Trowbridge, good or bad, is going to tell you that

23   he's a much more hands-on manager.  You're going to learn that

24   Mr. Trowbridge used to manage hundreds of individual hourly

25   employees.  And he keeps track, very detailed, of these

Opening Statement - Mr. Hayes

1    records.

2            He's also going to tell you, at that time period you

3    heard about where things changed, that he sat down with Darren,

4    gave him in writing, which you're going to see, his

5    expectations for Darren.  Hey, Darren, I'm your new boss, and

6    I'm going to expect you to do these things, including you can

7    still take time off, but you just need to keep me posted on

8    what's going on so I know what's going on at O'Hare.  Because

9    Mr. Trowbridge and Mr. Basham and the company is all

10   headquartered in St. Louis.  We don't have offices up here

11   other than Mr. Cuff's office.

12           We think that, again, is very, very important.

13           You're going to hear testimony from Darren's doctor.

14   And Darren's doctor, at least in part, is going to tell you

15   that Darren disregarded his medical advice.  We think that's

16   very relevant in this case.

17           We're also going to tell you that there were multiple

18   times, and we're going to show you evidence, where he would

19   tell Mr. Basham or Mr. Trowbridge that he was at work.  Little

20   Blackberry.  Or the telephone.  Or that he was going to see the

21   doctor.  Except there's no record at the doctor of him being

22   there.  Don't know where he was.  But when he told his employer

23   that he was at the doctor, he wasn't at the doctor.

24           We're going to go through multiple examples of that

25   for you because we think that's, again, very, very important.

Opening Statement - Mr. Hayes

1      The change in management that you're going to hear

2   testimony about, remember, there's nothing untoward or illegal

3   about that.

4      The company restructured itself, and Mr. Basham was no

5   longer Darren's boss.  It was Mr. Trowbridge.  It was just a

6   change in management.

7      Their different styles affected Darren, and you're

8   going to see an e-mail where he complained about it, but we're

9   free to do that.

10     A company is free to change its management, especially

11  when we put an employee on notice by telling him, in writing,

12  here's the expectations, here's what we expect you to do.

13     Very important issue for us.

14     One of the issues that came up, again, in the opening,

15  and we couldn't disagree more, that there was this serious

16  flare-up at one point that was caused by Darren doing so much

17  work when he shouldn't be there?

18     We don't think that's true at all.

19     We think the evidence you'll hear is that if he had

20  done what his doctor had said, he wouldn't have had a serious

21  flare-up.

22     It wasn't him coming to work that was causing these

23  flare-ups.  It was his disregard of the doctor and not taking

24  the right medicines and doing all these other things.

25     We think that that's very, very important.

Opening Statement - Mr. Hayes

1    When the plaintiff talks about the liability issue, as

2  I said, we agree that there's no question that the judge has

3  already decided that we're responsible.

4    But Mr. Trowbridge is going to tell you that as a

5  manager of over 20 years experience, he looked at what the law

6  says.  And the law talks about that you have to have 50

7  employees within 75 miles of the work site.  That's what it

8  says if you get FMLA.  We had Darren.

9    Now, years later, his lawyers -- and the Court agreed,

10  ultimately -- that because there were multiple companies, that

11  there were at least this number of employees, and that,

12  therefore, we violated the law.

13    But, remember, what you're here to decide, in part, is

14  whether Mr. Trowbridge, who is here being sued individually, is

15  responsible for reading a law that says 50 employees within 75

16  miles.  How many employees do we have in Chicago?  He's going

17  to tell you that he had Darren.

18    I think other than my remark about Christmas, I think

19  I'm pretty much there.

20    We're going to give you some testimony that we think,

21  again, is very relevant.  We don't want to drag it out.  We

22  don't want to go on for days.  But we think it's important, for

23  example, that when Darren says, "I'm taking a sick day" or "I'm

24  going to my high school reunion, can I have a couple of days

25  off around it," and then we find out that he was actually at a

Opening Statement - Mr. Hayes

1  job interview?  We think that's very relevant for you to

2  consider as you decide whether or not Darren is entitled to $1,

3  $10, or no dollars.

4        I think the evidence, as we walk through it, will show

5  you clearly that while we were mistaken in our interpretation

6  of the FMLA, that Mr. Trowbridge did his very best with the

7  law, made a mistake.  We're here today.  But you don't --

8  you're not required to award him any money just because we made

9  a mistake.

10        Thank you for your service.

11        I hope we won't be here all week, as he said, but we

12  think this case is a little more complicated than the

13  plaintiff's.

14        Thank you.

15        THE COURT:  Do you want to get started or should we

16  break for lunch now?  Do you want to --

17        MR. CAFFARELLI:  Let's take a -- your Honor, maybe a

18  break to --

19        THE COURT:  All right.  We'll suspend till

20  1:00 o'clock then for lunch.  And then we'll start hearing the

21  evidence at 1:00 o'clock.

22        So have a nice lunch time.  And we'll see you -- be

23  back about 25 -- or 5 minutes to 1:00, and then we'll get

24  started promptly at 1:00.

25        (Lunch recess taken.)

1          C E R T I F I C A T E

2        I certify that the foregoing is a correct transcript of the

3    record of proceedings in the above-entitled matter.

4

5
     /s/ GAYLE A. McGUIGAN                    March 26, 2012
6    Gayle A. McGuigan, CSR, RMR, CRR                  Date
     Official Court Reporter
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25